## UNITED STATES v. DI CORVO et al.

District Court, D. Connecticut. March 30, 1927.

John Buckley, U. S. Atty., and John A. Danaher, Asst. U. S. Atty., both of Hartford, Conn.

Thomas J. Spellacy and William E. Egan, both of Hartford, Conn., for defendants.

THOMAS, District Judge. After hearing had on the motions to exclude and suppress evidence and to return seized property, testimony was taken in support of the allegations of fact set forth in the petition. Before proceeding with a discussion of the law applicable to the case, it is important to first state the facts found from the evidence.

On November 12, 1926, certain prohibition agents came upon a building located on what is known as the "Nesbit Farm" in Clintonville, and there seized certain stills, drums of alcohol, and other paraphernalia used in the distillation of alcohol, and thereupon arrested the defendants, who were found upon the premises.

The officers had no search warrant. The seized articles were turned over to the Marshal and are now in his custody.

The Nesbit farm covers about 160 acres. Just how many buildings are on this farm does not accurately appear, but the photographs in evidence show several main buildings with certain other outbuildings in proximity to each other. About 70 feet from the highway is the farm dwelling house, a substantial two-story frame structure. About 150 feet from the dwelling house and about 200 feet from the highway, which curves away at this point, is a one-story and attic structure hereinafter called the "shed." About 40 feet easterly of this shed and about 230 feet from the highway there is another one-story and attic structure hereinafter called the barn. The barn faces westerly,

and the entrance to the barn is effected through a sliding door which faces the shed. There are no windows in the barn as one approaches from any southerly quarter, save one in the gable near the roof. There had been a window on the southerly side some 12 to 15 feet from the ground which had been boarded up. I find, therefore, that the interior of the barn was nowhere visible from the public highway. The farm house, the shed, and the barn are part of a group of various farm buildings, which, for our purposes, require no further description. A wire fence, supported by wooden posts, follows the contour of the highway and incloses the property.

On November 12th the prohibition agents proceeded in an automobile until they arrived at a point about 200 feet from the barn. Here they stopped for about 15 or 20 minutes and observed a man going in and coming out of the door. Thereupon they approached up a private roadway in the direction of the barn, to a point about 50 feet from the barn, where they observed 5-gallon tin cans and smelled the odor of alcohol. I now quote the testimony of Agent Healey:—

"We finally decided to go up directly to the barn; after seeing this incident—or seeing this man go inside and outside with a wrench in his hand. We could also see the five gallon cans, as I said before, and smell the odor of alcohol.

"We continued along this dirt road, proceeded up to the door of the barn; by looking in we could see three stills or copper vats, which we judged to be stills in operation.

"After approaching, why the only man that was visible at the time was a man who, if I recall right,—his name was Bosca. He was standing outside of the barn with a little truck with 'plumber' on it; I don't just recall the plumber's name there was on the truck.

"Upon entering—agent Smith, if I recall right, was the first one to enter the premises or the barn; and from behind the stills we called this man Di Corvo, the witness who has preceded me here today, and another young man—I just can't recall his name—one of the defendants. I then proceeded downstairs to the basement, where we found —myself and one of the accompanying agents—found Mr. Falcone with three other defendants."

This witness further testified that he had received instructions which directed him to go to the farm in question. Just what these instructions were does not appear in the record.

Mr. Smith who was in charge of the raid, testified, inter alia: "Well, we went to the Nesbit farm; we watched the place for approximately twenty minutes; we walked up the road for about fifty feet or one hundred feet; we could *get a good strong odor of alcohol;* we walked up to the barn door; it was open; I walked in; when I got in there were two men behind the still."

Smith did not testify about any man standing outside of the barn. On cross-examination he testified in part, as follows:

"My superior told me to go to Waterbury and I would meet a man that would give me information on stills.

"Q. You would meet a man that would give you information on stills. And you went to Waterbury? A. I did.

"Q. And you met this man? A. I did.

"Q. And he gave you the information on stills? A. Yes, sir.

"Q. And as a result of the information that you got on these stills from a man in Waterbury, you went to this particular so-called Nesbit farm? A. I did."

Agent Sposa thereupon testified, in part, as follows: "After observing the place for about twenty minutes we approached the barn; we were about forty or fifty feet away, we could see vapor coming out of the barn; we saw vapor and we heard engines going; when we got to the door of the barn, Agent Smith was in front, I was right behind him, we could see the stills from the outside through the opening of the door. We went inside and found this man working at the stills."

The defendants denied that the door was open—and that it was only opened when one of the agents knocked, and then only partially, and that the agents pushed their way into the barn. This testimony accords much nearer the probabilities of the situation.

From all of the credible evidence before me I find that the only evidence which the agents had of distilling operations within the barn was that furnished by the smell of alcohol. I do not believe that the door of the barn was open so as to permit the officers to see stills inside of the barn without making a preliminary entry, nor do I credit the testimony of the witness Sposa with reference to the vapor and the noise made by the engines. It seems to me that if vapor was issuing from the barn and was visible, and if

the engines could have been heard operating therein, these facts would not have escaped the observation of the other two agents, and that they would have testified to these facts. Nor am I disposed to accept the testimony of Healey that there was a man standing outside of the barn. The other two witnesses say nothing about this, as will be shown in the sequel. If Healey's story be accepted, and if no other person was actually known to the agents to be inside of the barn, then, under the rule stated in Temperani v. United States (C. C. A.) 299 F. 365, no offense was actually being committed in the presence of the officers.

I do not know whether the odor given off by the processes of distillation is the odor of alcohol. In several of the reported cases where the agents relied upon their sense of smell, the odors are described as being the odors of sour mash, or the odor of fermentation or distillation. It may, however, well be that the processes of distillation give off an odor identifiable as that of alcohol.

I further find that the barn in question was, in fact, used by the defendants as an illicit distillery, and that these six defendants lived in the shed which was only 40 feet away from the barn where the illegal operations were being conducted. The farmhouse had been let by the owner of the farm to a man whom the defendants described as their partner. The residence was in actual occupation, however, by a tenant who had been directed to move from the premises by the owner of the farm, so as to permit the same to be occupied by the defendant's partner. The men were temporarily occupying the shed in anticipation of this removal. So much for the facts found which are necessary for a consideration of the legal principles involved.

The petitioners invoke the protection of the Fourth and Fifth Amendments to the Constitution. It would seem as if, at this late day, these Amendments, which paraphrase the language of a more venerable Bill of Rights, would have had their intendments so fixed and determined by a chain of judicial construction, that little room would any longer exist for a reasonable doubt as to their cogency in any given case. But the case at bar seems to prove the contrary. The natural desire on the part of administrative officials to enforce the penal laws, and of the judiciary to lend vitality to such efforts, has created a shadowy terra incognita, wherein the interests of criminal justice collide with rooted constitutional immunities. Upon this region a great deal of casuistry has been expended in an endeavor to inhibit these immunities from defeating the immediate ends of justice.

■ We may start with the well-settled proposition that searches in general may not be made except upon a search warrant issued by a proper officer, upon a showing of probable cause. I do not understand that the District Attorney would seek to contest this general principle. The fact is, however, that searches and seizures without a warrant are, under certain circumstances legal, so that the question in every case is whether the circumstances in each particular case are such as to bring the case out of the rule which requires the issuance of a search warrant. The exception to the rule may be stated, generally, as follows:

■ Where a person is lawfully arrested, a search, which is incident to the arrest, may be made of the person and of the premises within which the person is found, and such articles may be seized as constitute the instrumentalities of criminality or the fruits of the crime.

■ In turn, under the statute, the lawfulness of an arrest without a warrant depends upon one of two things. If the arrest is for a felony, then it must appear that a felony has been committed, and that the officer had reasonable ground to believe that the arrested person committed the felony. If the arrest is for a misdemeanor, the offense must be committed within the presence of the peace officer. The offenses of unauthorized possession of liquor, or of the manufacture thereof, or of the sale thereof, are misdemeanors, and the theory of the government in the instant case is that the offense of manufacturing liquor was committed in the presence of the officers, and, therefore, warranted the arrest and incidental search and seizure without a warrant.

At the very threshold of this discussion, however, a question presents itself as to the right of a prohibition agent, in any event, to make an arrest without a warrant for a misdemeanor, even if committed in his presence. This question, while suggested by the language of Judge Mack in the case of Staker v. United States (C. C. A.) 5 F.(2d) 312, may perhaps be said not to have been definitely answered by him, but the right is apparently questioned, as appears from the language of the opinion as found on page 314. ■ We start with the proposition that there is no substantive federal common law, whether civil or criminal, administered as such by the courts of the United States, but that the

procedure followed in federal prosecutions, unless otherwise directed by statute, is that of the common law.

I shall assume, without so deciding, that an arrest prior to the laying of an information or to the filing of an indictment is a step in procedure thereby making the common law applicable. If it is not a procedural fact, then the common law may not be invoked to justify an arrest without a warrant by a Federal officer.

Assuming then, that the principles of the common law, obtain, we come directly to the principle that, at common law, no lawful arrest can be made of a person charged with a misdemeanor, except upon the warrant of a magistrate, unless the offense involved a breach of the peace committed in the presence of the arresting person. The rule is summarized by Zoline in his Federal Criminal Law, vol. 1, p. 30, as follows: "At common law, a peace officer could not arrest without a warrant a person who committed a misdemeanor whether in his presence or not. A breach of the peace was the one exception to the rule. An officer could arrest one who committed a breach of the peace in his presence."

Now, it is quite true that most states have somewhat modified the rule of the common law, so that, in the state of Connecticut, for instance, a peace officer may arrest without a warrant, for a misdemeanor committed in his presence, even though such misdemeanor did not involve a breach of the peace.

█ If, then, prohibition agents have the powers of peace officers, they may arrest without a warrant for a misdemeanor committed within their presence, even though such misdemeanor does not involve a breach of the peace. A search of the statutes, however, fails to reveal the grant of any such general police power to prohibition agents. The scope of their power to search and arrest is determined by sections 2, 25, and 26 of title 2 of the National Prohibition Act (27 USCA §§ 11, 39, 40). In none of these sections are prohibition agents vested with the general powers of a peace officer. The absence of any language giving prohibition agents such power is the more persuasive when we contemplate the provisions of section 788 of the Revised Statutes (28 USCA § 504), which provides that: "The marshals and their deputies shall have, in each State, the same powers, in executing the laws of the United States, as the sheriffs and their deputies in such State may have, by law, in executing the laws thereof."

There is thus no difficulty in holding that a United States Marshal has the power to effect an arrest without a warrant for any federal misdemeanor committed in his presence, because there is an express statutory provision conferring upon such Marshal the powers of local peace officers.

In the absence of a similar provision with reference to prohibition officers, their authority to effect an arrest without a warrant must be found either in the common law, as unmodified by the local statutes, or in the language of the federal statutes.

We have already seen that, at common law, the power to arrest without a warrant, in case of misdemeanor, existed only where the offense constituted a breach of the peace. It will hardly be contended that clandestine distilling operations, hidden from all scrutiny and conducted on private property, is such a breach.

An examination of the statutes yields an impression quite opposed to the theory of any legislative grant of such power. Prohibition agents are to investigate and report violations of the Prohibition Act to the United States Attorney who is charged with the duty of prosecution. They may swear out warrants for the apprehension of offenders. Section 1014 of the Revised Statutes (18 USCA § 591) is made applicable. That section, instead of making provision for arrest without a warrant, empowers local magistrates to apprehend offenders against the federal laws, and adopts the state practice in the matter of issuing and executing criminal process. The whole section is fraught with the presupposition that arrests are to be made only upon judicial process.

Section 25 of title 2 of the National Prohibition Act (27 USCA § 39) enacts restrictions upon the issuance of search warrants with reference to private dwellings. Title 2, § 26 (27 USCA § 40) is the only section granting the right to prohibition agents to effect an arrest without process. But that section is limited to cases where the agent discovers the person in the act of transporting intoxicating liquor and, in the instant case, no such fact appears.

I am, therefore, led to the conclusion that prohibition agents, as such, are not vested with the right to arrest, without a warrant, a person charged with a misdemeanor committed in their presence, unless such misdemeanor constituted a breach of the peace, or unless the offense is comprehended within section 26, title 2 of the National Prohibition Act (27 USCA § 40). As a search without a

warrant can only be justified where it is incident to a lawful arrest, and part, as it were, of the res gestæ of that arrest, the search in the instant case is tainted with the same element of illegality.

I shall, however, assume the possibility of error in this reasoning, and proceed to a consideration of the second element in the case. Assuming then, that a prohibition officer is vested with the same power to effect an arrest as a local peace officer, the question reduces itself to this: Was the misdemeanor in question committed in the presence of a prohibition agent?

Upon the facts as found, the only ground upon which it can be said that the crime of manufacturing liquor was being perpetrated in the presence of the officers was that, at a point about 50 feet removed from the building, which point was located on the farm land, the odor of alcohol in the processes of manufacture was distinctly perceptible to the prohibition agents. From such olfactory sensation, it was rational to conclude that the building was being used as an illicit distillery. So the question now is whether a misdemeanor is committed in the presence of a prohibition agent whose only evidence is the fact that 50 feet away he smelled alcohol.

The cases are by no means in harmony. In McBride v. United States (C. C. A.) 284 F. 416, the defendant neither resided nor personally worked upon the premises which had been entered. These premises consisted of a stable located at some distance from the residence. The agents did not detect the odor of alcohol before entering upon the farmstead, but, upon approaching the stable, plainly noticed this odor. No one was in the stable at the time, but the agents perceived a trapdoor leading to the cellar, which, in turn, disclosed a light and the steam of whisky coming from the cellar. Upon descending into the cellar they found two negroes in charge of the still. In this case the court held that the offense was committed in the presence of the officers, and that, therefore, the seizure of the stills and their use in evidence was valid. Judge King, writing for the court, at page 419 of 284 F. used this general language: "Where an officer is apprised by any of his senses that a crime is being committed, it is being committed in his presence, so as to justify an arrest without warrant."

In Rouda v. United States (C. C. A.) 10 F.(2d) 916, the facts there showed that a prohibition agent, watching at the outside of a building, observed a man enter the ground floor with two 5-gallon cans of alcohol. (Just how he knew these cans contained alcohol does not appear.) The ground floor was occupied as a hosiery store, and the man, after going in a short distance, turned to one side and disappeared down a flight of stairs. The agent procured assistance and they entered the store and went downstairs into the basement. The front of this was unoccupied, but the rear had been closed off by a partition, making an inclosed room. The door leading into the room was open, and through the open door the agents were able to see the defendants inside. They were pasting whisky labels on bottles. The agents saw some large jars of whisky, alcohol, and water. They entered the room and arrested the defendants, and one of them went back for a search warrant. The court held that, while a trespass had been committed upon the owner of the hosiery shop, such trespass was not available to the defendants on a motion to reject the evidence. The agents could see through the open door into the premises actually occupied by the defendants, and what they saw constituted visual evidence of the commission of a crime. In other words, a crime was being committed in their presence, in the sense in which the word "presence" is ordinarily used and understood.

In Temperani v. United States, supra, a search had been made without a warrant. The premises were a residence, a one-story dwelling with a garage underneath. In 299 F. on page 366 of the opinion, the facts are set forth as follows: "On the above date the officers visited the premises, and detected the odor arising from the manufacture of intoxicating liquor emanating from the garage. They thereupon forced an entry and discovered stills in operation, a quantity of intoxicating liquor, and a quantity of mash used in the manufacture thereof. At the time of the entry there was no person in the garage, and the plaintiff in error was absent from home."

And on page 367, Judge Rudkin said: "The government, as we understand it, does not claim the right to search a private dwelling or garage under the facts disclosed by this record, but an attempt is made to justify the conduct of the officers under the common-law or statutory rule permitting peace officers to make arrests for offenses committed within their presence. But here the offender was not in the presence of the officers; he was not in the garage, and they had no reason to suspect that he was there. Laying all pretense aside, the officers entered the garage, not to apprehend an offender for committing an of-

fense within their presence, but to make a search of the premises to obtain tangible evidence to go before a jury, and whatever necessity may exist for enforcing the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138¼ et seq. [27 USCA § 1 et seq.]), or other laws, the violation of rights guaranteed by the Constitution cannot be tolerated or condoned. If present laws are deficient in not permitting the search, in a constitutional way, of homes where intoxicating liquor is known to be manufactured, the remedy is with Congress, not in subterfuge or evasion. For these reasons, the court should have kept from the jury all property found on the search and all evidence given by the officers concerning the same. Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654."

At this point it is well to note that this case, as well as United States v. Rembert (D. C.) 284 F. 996, were cited with approval by the Supreme Court in Agnello v. United States, 269 U. S. 20, 46 S. Ct. 4, 70 L. Ed. 145, 51 A. L. R. 409, and that in Byars v. United States, 273 U. S. 28, 47 S. Ct. 248, 71 L. Ed. 520, decided by the Supreme Court January 3, 1927, that court again cited the Temperani Case, so that it seems clear that whatever conflict of authority there may be in the adjudicated cases the principles enunciated in the Temperani and Rembert Cases control.

It will be noted that in the Temperani Case the court distinctly held that the mere fact that the odor of alcohol emanated from the premises was insufficient as a predicate for the conclusion that the offense was being committed within the presence of the officer. What would have been the result if the defendant himself had been present, and if the officers knew that he was in the building, does not appear.

In Schroeder v. United States (C. C. A.) 14 F.(2d) 500, the facts were as follows: "A prohibition officer was led to inspect the defendant's house by the strong and penetrating odors of boiling mash and fermentation, which he said were unmistakable and which came directly from the house. The house was situated on a corner. Extending from it was a small room, 'just like a little ell.' Into that ell the officer entered through a door which wan closed, but not locked. On entering it he found that it was a mash room. Through an open door he saw into an adjacent larger room, which was used as a still room, and saw the defendant in the active operation of two 80-gallon stills. The room contained 1,200 gallons of mash, 100 gallons of jackass brandy; 12 sacks of sugar, 20 barrels of yeast, and other material used in making intoxicating liquor. Beyond the still room, and connected therewith by a door which was closed, was a garage. The garage was not entered. There was no connection between the mash room and the still room with the upper portion of the house, nor were either of those rooms used for any household purpose."

Judge Rudkin, speaking for the Circuit Court of Appeals, said: "To uphold an entry and search such as was here made is to entirely ignore 'a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motorboat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' Carroll v. United States, 267 U. S. 132, 153, 45 S. Ct. 280, 285 (69 L. Ed. 543, 39 A. L. R. 790)."

Again, in Bell v. United States (C. C. A.) 9 F.(2d) 821, a search warrant had been obtained which was issued on an insufficient affidavit. It appears from the dissenting opinion, which stated the facts of the case, that the officer had smelled the unmistakable odor of fermenting mash coming from the building. He had seen cars enter and leave the premises at all hours of the day and night, and had received authentic information as to the nature of the operations conducted in the building, and had reasonable grounds for believing that an operator was in charge of the premises, which belief turned out to be a fact. Nevertheless, the court held that the search in that case was invalid—and this too, in spite of the fact that there was something more than a mere odor of alcohol, which would give to the officer the right to infer the existence of distilling operations.

In Giusti v. United States (C. C. A.) 4 F.(2d) 703, an agent procured a warrant to search the premises described as "a certain building located on northeast corner of Twenty-Eighth and Avenue L, City of Galveston, Texas, operated as a grocery store." The officers, after searching the store and finding nothing, proceeded up a flight of stairs, and, after they got into the hall, they smelled mash. They then went into a room and found six 50-gallon stills, some 1,850 gallons of mash, and 13 gallons of whisky, and destroyed the stills and mash and took possession of the whisky. They did not know who operated the grocery store, but it was not the defendant's. There were two apartments up-

stairs, in one of which the owner of the grocery store lived, and the other occupied by the defendant, in which the stills, mash, and whisky were found. There was no one in the apartment when the search was made. The defendant appeared upon the scene shortly thereafter and was arrested. Judge Foster, on page 703 of 4 F.(2d), said: "When the officers invaded the upper part of the building, they did so unlawfully, and there was no justification to make further search, because they then discovered the odor of mash." But it must be noted here that again there was no evidence to indicate the presence of any person within the room before the officers entered.

In Staker v. United States (C. C. A.) 5 F.(2d) 312, it appeared from the evidence that the prohibition agents, while passing in Maysville, Ky., along the public street or highway, passed the defendant's house, which was used by him as his dwelling, and detected the odor of mash emanating from the basement and made affidavit before the police judge and secured a warrant to search the dwelling house. The search warrant, however, was invalid, because of the defective nature of the affidavit upon which it was based. However, armed with the warrant, the officers entered the premises and found a 12-gallon still in operation and some moonshine whisky. The opinion in that case is very interesting and suggestive. It refers to section 25 of title 2 of the National Prohibition Act (27 USCA § 39), which prohibits the issuance of a search warrant against a private dwelling, except where it is being used for the unlawful sale of liquor.

In the instant case I do not regard the barn, in which the distilling operations were being conducted, as a private dwelling within the definition of section 25 of title 2 of the National Prohibition Act (27 USCA § 39), and, consequently, the distinction made in the Staker Case between the case of *sales* in a dwelling house and the case of manufacture in such a house is therefore not relevant to the matter in hand. But Judge Mack, who wrote the opinion, in discussing principles which are pertinent to the case at bar, goes on to say on page 314 of 5 F. (2d): "The government attempts to justify the search on the ground that peace officers have the right to arrest and search a person committing a criminal offense in their presence. Leaving aside the question whether prohibition agents are peace officers (see Brady v. U. S., 300 F. 540 [C. C. A. 6]; Agnello v. U. S., 290 F. 671 [C. C. A. 2]), the offender was not in the presence of the officers, and there is no evidence that they had reason to suspect that he was (Temperani v. U. S., 299 F. 365 [C. C. A. 9]). Moreover, it may be questioned whether, in cases of misdemeanor, a peace officer or a private person has any power of arresting without a warrant, except when a breach of peace has been committed in his presence, or there is reasonable ground for supposing that a breach of peace is about to be committed or renewed in his presence. Wilgus, Arrest without Warrant, 22 Mich. Law Rev. 541, 673, 798, especially 703-709. There is no evidence here of any breach of peace, existing or imminent, which would justify the exercise of powers sanctioned by the common law only in situations of emergency."

In Koth v. United States (C. C. A.) 16 F.(2d) 59, cited by the government, it appeared that prohibition agents approaching the premises detected the odor of fermenting mash and distillation some quarter of a mile from the house, and saw one of the defendants in an intoxicated condition coming up the hill from the direction in which they later found the still. The still was in the defendant's place of residence. The agents went down a stone boat trail some 300 yards from where the still had been pointed out to them, and there they found defendant operating the still. There was fire underneath the cooker of the still.

It does not appear from the facts stated in the opinion that it was necessary for the officers to make entry upon the building, nor does it appear whether the still, if located inside of the building, was not easily visible from the outside. In the absence of these important elements, it is difficult to determine just what applicable principle is decided in the Koth Case.

To attempt to reconcile all the adjudications on this subject would be a futile procedure. It is frequently said that each case must be decided on its own facts.

After a review of all of the authorities that I find bearing directly upon the question in hand, I entertain the view that, under the circumstances of the case at bar, the misdemeanor was not committed *within the presence of the officers,* even in the expanded sense of the word *presence,* which sometimes finds its way into the decisions.

It is quite true that it is possible that a transaction may be said to take place in the presence of a person, even though this transaction is not within his vision. Nevertheless, where we are confronted with a question

as close as this question is, it seems to me that determining weight should be given to the broad considerations of constitutional right intended to be saved and perpetuated by the Fourth and Fifth Amendments. Especially is this so where, as here, the National Prohibition Act fortifies the officers with the right to secure a search warrant from the United States Commissioner, which would have been a very simple matter to do, as the distance from the farm where the raid was made to the office of the Commissioner in New Haven is only six or seven miles. Why the officers did not secure the search warrant does not appear, but they cannot now complain that their work was for naught when only their laches or failure is to blame. Especially is this so where, as in the instant case, it would have been a fairly simple matter to procure the necessary search warrant after the facts had been discovered which would have amply justified the issuance of a search warrant by the Commissioner.

For, after all, it must be remembered that the real question is not whether the arresting officer had reasonable ground to believe that an offense was being committed, but whether it was actually committed in his presence. Even though, from certain predicates before me, whether of hearing, sight, or smell, a certain inference is logically coercive, it does not follow that the inferred fact is "present" in the unrefined, non-metaphysical sense of the common law.

A man's auditory impression, while seated before a loud speaker, may categorically inform him that an orchestral concert is being conducted at some point beyond his vision. The sensation is immediate and the inference impossible of evasion; yet it will hardly be asserted that the concert is being conducted in the listener's "presence," as the term presence is ordinarily used, and as it is undoubtedly intended in the statute. The element of close proximity and the possibility of reciprocal reaction are involved in the ordinary conception of the term "presence."

It is true that no hard and fast line may be drawn, and that on many of the conceded facts "presence" may be differently construed.

■ I admit that the question is by no means free from doubt, but my conclusion is that, in a matter of doubt, it is better to uphold the Constitutional immunities than to be keen to discover a basis for circumventing them.

I think the language of the Supreme Court in Byars, Petitioner, v. United States, 273 U. S. 28, 47 S. Ct. 248, 250, 71 L. Ed. 520 decided on January 3, 1927, embodies the spirit which should guide federal courts in judging in any doubtful case involving the application of the Bill of Rights. The court there said: "The Fourth Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right."

Or, as Justice Bradley said in Boyd v. United States, 116 U. S. 616, at page 635, 6 S. Ct. 524, 535, 29 L. Ed. 746: "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis."

In the Byars Case we have about the last word from the Supreme Court on the merits of the controversy at bar. It is instructive to note that on page 29 of 273 U. S., 47 S. Ct. 248, 71 L. Ed. 520, Justice Sutherland said: "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light; and the doctrine has never been recognized by this court, nor can it be tolerated under our constitutional system, that evidences of crime discovered by a federal officer in making a search without lawful warrant may be used against the victim of the unlawful search where a timely challenge has been interposed."

It is safer to require a strict compliance with the law that search warrants be procured than to permit prohibition agents to become a law unto themselves and improperly act without a search warrant. The machinery is provided for the use of the prohibition agents, and in such a case as this record presents it appears that here was an instance where the agents not only could have secured a warrant, but should have done so before making the arrest and seizure.

■ The question is raised that the barn was not the dwelling house of the defendants. But this question could become of importance only if the defendants had insisted upon immunity from search and seizure under the provisions of section 25, title 2 of the National Prohibition Act (27 USCA § 39). The Fourth Amendment throws a mantle of protection around "houses" generally —not merely dwelling houses. A person's office or place of business is quite as im-

mune from search without a warrant as his kitchen or bedroom. The barn was the place where the defendants conducted their business, however illegal that business may have been. The things that were seized were the effects of the defendants.

Finding as I do, that the offense was not committed within the presence of the prohibition officers, the conclusion must be that the search and seizure, without a warrant were illegal, and that, therefore the evidence obtained upon such search and seizure must be suppressed.

That part of the verified petition which is the predicate for the motion to return the property alleges that it was "seized from a shed which was in their possession and control and which was part of their private dwelling premises."

The decisions in the various circuits are not uniform upon the question of the return of liquor unlawfully seized. Whatever the rule may be in other circuits, I think it reasonably certain that the Circuit Court of Appeals for the Second Circuit holds that the liquor or other property unlawfully seized can only be returned to one who at least claims to be the owner or to have had the possession of it when it was unlawfully seized.

In Gallagher v. United States (C. C. A.) 6 F.(2d) 758, Judge Hand, on page 759, said: "All we hold is that in the case of an unlawful seizure of liquors, themselves unlawfully possessed, if anyone be entitled to their summary return under either section 25 of title 2 of the National Prohibition Act (Comp. St. Ann. Supp. 1923, § 10138½m [27 USCA § 39]) or section 16 of the Search Warrant Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 10496¼p [18 USCA § 626]), he is only the person whose possession has been disturbed. We do not, therefore, intimate that either Gallagher or the warehouse would not succeed in a summary proceeding, if he or it were to file a verified petition, alleging actual possession at the time of the seizure, and, if that allegation were proved, should it be controverted. We have already said as much in Re Silver Slipper Co. and Re Hollywood Cabaret, 5 F.(2d) 651, recently decided."

In the Hollywood Cabaret Case, the motion to vacate the search warrant and to return the property were both denied by the District Judge, and upon appeal the Circuit Court of Appeals reversed the order of the District Judge and granted the motion to vacate and the motion to return. Upon reargument of the motion to return, the court modified its former decision and denied the motion to return. On page 658, of 5 F.(2d) Judge Rogers said: "If a court is going to return property which has been unlawfully seized, it should be restored to the one from whose possession it was unlawfully taken, or to one who claims it as owner." And again, on page 659, the concluding sentence of the opinion reads: "The liquor can only be restored, if it is to be restored, to one who at least claims to be the owner, or to have had it in his possession when it was wrongfully seized."

The allegations in the petition in the case at bar do not meet the requirements of the rule laid down by the Second Circuit, Circuit Court of Appeals. The petition here merely alleges that the property was seized from a shed, which shed was in the possession of the defendants. There being no sufficient allegation of ownership or possession of the seized property in these defendants, it follows that the motion to return must be denied.

An examination of some of the cases relied upon by defendants and urged in their brief as supporting their position fail to show whether there was any allegation of ownership or possession in the petitioners. I am aware of the fact that some courts have held that, if the property was unlawfully seized, it is the duty of the government to return it, and that the court will, upon proper motion, restore it to those from whom it was unlawfully seized, but, in view of the ruling of our Circuit Court of Appeals, I am constrained to hold that, if the property is to be restored, there must be allegation and proof in support of the fact that there was either ownership or possession in the petitioners.

The motion to suppress the evidence is granted, and the motion to return the property unlawfully seized is denied, and it is so ordered.