## UNITED STATES v. VLAHOS et al.
### No. C–14799.

District Court, D. Oregon.
March 22, 1937.

Manley B. Strayer, Asst. U. S. Dist. Atty., of Portland, Or., for the United States.

Paul M. Long and Frank Swope, both of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

The defendants were indicted for a conspiracy to violate the laws relating to the operation of a distillery and the Liquor Tax Administration Act June 26, 1936, 49 Stat.1939, and also, in separate counts, for the substantive offenses of carrying on the business of distillers of spirits and liquors without having given bond as required by law, and for having in their possession untaxpaid distilled spirits.

A motion to suppress the evidence was made by all three defendants upon the ground that an illegal search was made whereby evidence was obtained. The court reserved the motion until trial. The cause was tried before the court without a jury.

The officers had reliable information that Vlahos was operating a still in the vicinity of Wilsonville and hauling supplies and liquor across the Wilsonville Ferry of the Willamette river. On September 23d the officers saw a heavily loaded truck cross the ferry at night and discovered later that the truck was registered under the name of John Vlahos, and on the night of September 25th they again saw the truck cross the ferry and followed it to the F. W. Wagner farm. For several nights thereafter they observed heavily loaded trucks and cars drive in and out of the Wagner premises and saw defendants unload bulky articles at the distillery and load what appeared to be kegs full of liquor. One night they saw a truck leave the premises with its lights extinguished, preceded by a coupé driven by Vlahos, both vehicles being heavily loaded, and at the same time detected a faint odor of mash coming from the direction of the building and heard a water pump running at the barn. On the night of October 1st the officers went into a pasture near the Wagner residence. That time they again heard the water pump and detected the odor of ferment-

ed mash and heard the sound of the roar of burners, and on the same night they saw a coupé go to the stillhouse, unload supplies, reload, and leave. Similar activities were noted the next night from a similar position. The distillery was in a separate inclosure surrounded by a high fence of chicken wire in which there was a gate approachable only through the yard of the Wagner residence. This gate was apparently guarded by some sort of a signal device. While watching on the night of October 3d, the officers saw a coupé drive up to the distillery while they were watching the premises from a grain field nearby. They followed up the road through the yard surrounding the Wagner residence, and before entering the inclosure occupied by the distillery detected a strong odor of fermenting mash, according to their testimony. They went inside the inclosure close to the building where they heard some one say: "We will run the mash tomorrow night." One of the officers pulled back a corner of the covering over a window and saw the condenser of a still and other paraphernalia connected with the distillation of liquor. Inside the inclosure the odor of mash was very strong. At the same time, one of the officers saw in the back seat of the coupé a 25-pound package of yeast and a bottle with no revenue stamps attached, containing an amber-colored fluid. The defendant Vlahos came out of the building to get the yeast and returned to the building. Later, Vlahos came out from the distillery and was arrested as he was entering the car. The officers then entered the building and arrested Karmones. Upon this entry, the still and other evidence, which it is sought to suppress, were seized, together with the bottle of untaxpaid liquor in the car and two kegs of untaxpaid whisky which were in the rear of the coupé, concealed. There was contrary testimony of a state officer who accompanied the federal officers at the time of the seizure to the effect that no odors could be smelled outside of the distillery and that there was no burner under the still and that the bricks beneath were cold. Admission of the defendants makes it clear that the defendant Wagner rented the distillery with the inclosure to Vlahos for $200 a month.

The building and the inclosure were used as a distillery and for no other purpose, and that portion of the premises was under lease from Wagner to Vlahos.[1] The motion of the defendant Vlahos to suppress will be considered in the first instance. The officers trespassed upon the premises of Wagner in order to reach this inclosure, but Vlahos can take no advantage of that circumstance.[2] If the testimony of the officers is given full weight, they unquestionably were in possession of sufficient evidence to have obtained a search warrant for these premises prior to the night when the arrest was made, and each day they were in Portland, where such a warrant could have been obtained. If a dwelling house were involved instead of a building used exclusively for the operation of a distillery and in which there were persons actually engaged in the illegal transaction, the search could not be upheld. The officers, at the time of their entry, did not know that the distillery was not within the curtilage of the Wagner dwelling house but had been severed therefrom by the technical legal barrier of the lease from Wagner to Vlahos. Without the knowledge of these facts, the action of the officers was high-handed and arbitrary in the extreme. They had ample opportunity to obtain a search warrant day after day but did not do so. The reason for this neglect is not apparent but seems to indicate that their superior officer did not consider the information which was available prior to the night of October 3d as sufficient basis for the application.

But it is said there was sufficient ground to arrest the defendant Vlahos without a warrant. It must be remembered that the charge in the instant case is one of felony,[3] and this distinguishes a great mass of cases under the former prohibition laws when the charge was

---

[1] The mere fact that Karmones may have slept in the structure did not make it a dwelling house. The fact that a servant slept in a barn or a porter in a warehouse for a temporary purpose did not make the building a dwelling house under the law of burglary. 1 Hale 557, 558.

[2] Rouda v. United States, 10 F.(2d) 916, 918 (C.C.A.2); Coon v. United States, 36 F.(2d) 164, 165 (C.C.A.10).

[3] Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543, 39 A.L.R. 790.

one of misdemeanor.[4] In a case of misdemeanor, the officers have no right to arrest unless the offense was committed in their presence,[5] and even then, there is some doubt whether the right exists unless it amounts to a breach of the peace. If a felony actually has been committed and the officers have reasonable grounds to believe that the person arrested is the one who committed the crime, they have probable cause for the arrest.[6] Here a felony actually had been committed. Before the officers entered the leased inclosure, they had in their possession facts which certainly indicated to them that a felony was being committed and that Vlahos was the principal offender. The nocturnal activity extending over a considerable period at this barn, coupled with the presence of Vlahos of whom they had the right to entertain suspicion because of the information which they had received, the operation of the trucks without lights, the smell of fermenting mash, and the sound of roaring burners were sufficient to advise them of the illegal act. Finally, they did actually arrest Vlahos on the outside of the building. Following the arrest of Vlahos, they actually entered the building for the purpose of arresting Karmones, and when they did so the illegal operation was disclosed to them. The great difficulty arises in the fact that the officers have directly testified that they did not go into the inclosure with the intention of arresting anyone, but solely for the purpose of making a further search. The information obtained by this further search was the fact of the presence of the residue of the mash in an outhouse, the presence in the car driven by Vlahos of a bottle probably containing untaxpaid liquor, and a glance through the window at the distillery itself. In Papani v. United States, 84 F.(2d) 160, an illuminating opinion by the Circuit Court of Appeals of the Ninth Circuit, written by Judge Haney, the intention of the officers at the time they entered the inclosure is established as the touchstone. Notwithstanding the declaration of the officers, the evidence indicates that they were "galled" at the direction of their superior to obtain further evidence of an illegal operation before asking for a search warrant, and that they had actually decided to consummate the transaction on that occasion by search or arrest as circumstances dictated.

In one respect, circumstances justified their action. They were dealing with a fast-moving automobile which seemed to have some connection with the illegal operation.[7] In this car they saw evidence of the commission of a felony which alone justified the arrest of Vlahos and the subsequent search of the car.[8] But the evidence as to the contents of the car was not obtained upon the open road, but involved a trespass with the intention of making a search. Likewise, by examining the contents of the small outhouse and raising the covering of the window, other evidence had been obtained prior to the arrest.

Finally, the government raises the point that the search here involved was not of a dwelling house or of a building within the curtilage of a dwelling house. By virtue of the lease from Wagner to Vlahos, this distillery and the premises within its inclosure were detached from the dwelling house as efficaciously as if this parcel had stood in the name of John Vlahos in fee simple.[9]

There is a marked conflict in the decisions as to whether the same protection is accorded to a detached building upon a separate parcel of ground as is given to a dwelling house or building within its curtilage. "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures" is guaranteed by the language of the Fourth Amendment. Some opinions go so far as to indicate that there is no distinction.[10] The language

---

[4] United States v. Di Corvo (D.C.) 37 F.(2d) 124, 127.

[5] See Carroll v. United States, 267 U. S. 132, 156, 45 S.Ct. 280, 286, 69 L. Ed. 543, 39 A.L.R. 790.

[6] Papani v. United States, 84 F.(2d) 160, 162 (C.C.A.9). See Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035; Kwong How v. United States, 71 F.(2d) 71 (C.C.A.9); Mattus v. United States, 11 F.(2d) 503 (C.C.A.9).

[7] Carroll v. United States, supra.

[8] See Malone v. United States, 67 F. (2d) 339, 341 (C.C.A.9).

[9] Earl v. United States, 4 F.(2d) 532 (C.C.A.9); Kelley v. United States, 61 F.(2d) 843, 845, 86 A.L.R. 238 (C.C. A.8).

[10] United States ex rel. Frank v. Mathues (D.C.) 17 F.(2d) 274, 275; In re Phœnix Cereal Beverage Company (C.C.A.) 58 F.(2d) 953, 956.

of the amendment itself, the fact that Congress passed an act especially protecting dwelling houses under the prohibition amendment, and the leniency with which the courts have viewed searches of detached buildings indicates that some differentiation exists. It is certainly true that a detached building or a place of business cannot be searched without a warrant where there is no evidence that any one is inside[11] even though indications of the existence of crime are evident.[12]

A reconciliation of the diverse holdings can be made upon the ground that a dwelling house has a curtilage while a detached building, manufacturing plant, or other structure has none. The word "curtilage" from its origin has denoted only the inclosure surrounding a dwelling house.[13] The term is of great importance at common law, since the breaking and entering of a building outside of the curtilage did not constitute burglary.[14] It has been universally recognized that evidence obtained in a public place[15] or a place to which all persons may have access without a technical trespass may be introduced.[16] Furthermore, evidence obtained in the open fields, even if the entry thereto is a trespass, is admissible.[17]

The courts have likewise always recognized the distinction between searches without warrant where an automobile was involved in the apparent consummation of a criminal act and cases which involved the search of a building alone.[18]

Applying these principles, the arrest of Vlahos must be upheld. It is true that the officers entered the inclosure without intention of making an arrest, but this inclosure was not the curtilage of a dwelling place, but rather an open space surrounding a building devoted to the manufacture of liquor. A felony actually had been committed and the officers had good reason to believe that Vlahos was one of the participants in the criminal act. His activities in the inclosure alone justified such a conclusion. There was sufficient evidence to justify the officers also in the conclusion that the automobile which stood in the open space was used in the commission of the crime because of the fact that articles were carried into the building from the car and carried out of the building and placed in the car. Furthermore, the officers saw a bottle apparently containing untaxpaid liquor on the seat of the automobile. The arrest of Vlahos was not made in the building but in the open space. The arrest of Karmones was made within the structure, but it was unquestionably the intention of the officers to make an arrest when they entered the building. The seizure of the articles under the ban of the law was a proper incident of the arrest of Karmones inside the structure. The only debate which could exist is whether the seizure of the articles was invalidated by the fact that the agents entered the premises without the intention to make an arrest and by the fact that while in the inclosure they saw the residue of mash in one

---

[11] Of course, if there is actually some person in the building engaged in a criminal act the ordinary principles governed. Earl v. United States, supra; Donahue v. United States, 56 F.(2d) 94 (C.C.A.9); Kelley v. United States (C.C.A.) 61 F.(2d) 843, 845, 86 A.L.R. 238.

[12] Taylor v. United States, 286 U.S. 1, 5, 6, 52 S.Ct. 466, 467, 76 L.Ed. 951.

[13] "Curtilage" is defined in Webster's new International Dictionary, Second Edition, as "a yard, courtyard, or piece of ground, included within the fence surrounding a dwelling house." The derivation is given from the old French, cortillage, meaning court or courtyard. Bouvier's Law Dictionary, Baldwin Cent. Ed. (Rawle's Third Rev., p. 741) defines "curtilage" as "the enclosed space immediately surrounding a dwelling house contained within the same enclosure."

[14] 4 Blackstone's Commentaries, 224;

N.Y. 561, 574, 27 Am.Rep. 87; State Regina v. Gilbert, Carrington and Kirwin's Reports, 84; Quinn v. People, 71 v. Sampson, 12 S.C. 567, 32 Am.Rep. 513.

[15] Dillon v. United States, 279 F. 639, 645, 646 (C.C.A.2).

[16] Lee Kwong Nom v. United States, 20 F.(2d) 470, 472 (C.C.A.2).

[17] Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; Raine v. United States, 299 F. 407, 410 (C.C.A.9); Koth v. United States, 16 F.(2d) 59, 61 (C.C.A.9); Carvalho v. United States (C.C.A.) 54 F.(2d) 232.

[18] Husty v. United States, 282 U.S. 694, 700, 701, 51 S.Ct. 240, 241, 242, 75 L.Ed. 629, 74 L.Ed. 1407. The principle is applied even where a technical trespass is involved. Ferracane v. United States, 47 F.(2d) 677 (C.C.A.7); United States v. Rogato (D.C.) 39 F.(2d) 171.

house, and looking through a window saw the illegal articles. Cumulative force of the circumstances consisting of the knowledge which the officers had prior to entry of the inclosure, the fact that the building was used solely for manufacturing of illicit liquor and stood on a piece of ground which was leased to Vlahos, the fact that an automobile containing a contraband article was upon the premises, and the fact that lawful arrests were made, relieves the search without a warrant from the taint of illegality.

There is another ground upon which entry into the building itself may be justified. It was a distillery in which articles subject to tax were made.

The Congress of the United States declared in 1879 (26 U.S.C.A. § 1501) that:

"Any collector, deputy collector, internal revenue agent, or inspector may enter, in the daytime, any building or place where any articles or objects subject to tax are made, produced, or kept, within his district, so far as it may be necessary, for the purpose of examining said articles or objects.

"When such premises are open at night, such officers may enter them while so open, in the performance of their official duties."

The officers involved were internal revenue agents. The premises were open at night, and the officers were in performance of their official duties.

This statute upon its face conferred permission upon these agents to enter the structure at night because the premises were open at the time of the visitation. This law was first enacted as sections 37 and 38 of chapter 173 of the Act of Congress passed June 30, 1864 (13 Stat. 238), which gave permission to "revenue agents" to enter "any brewery, distillery, manufactory, building, or place where any property, articles, or objects, subject to duty or taxation * * * are made, produced, or kept." The terms of this proviso are general and relate, not to distilleries specifically, but to structures generally where untaxpaid or dutiable articles were kept or made. The act of 1864 (13 Stat. 218), of which the sections under investigation were a part, was entitled "An Act to provide Ways and Means for the Support of the Government, and for other Purposes," and as such covered generally the Commissioner of Internal Revenue and his office and subordinates and assessment and collections of internal revenue including duties, stamps, and taxes. The enactment is presumed to be constitutional. The fact that it has stood upon the statute books and been used as a foundation for action for seventy years strengthens the presumption.

The act indicates that all places devoted to the making or storing of articles subject to tax are public. Permission to enter may be assumed from the entry of the person into a business the product of which is taxable. In fact, the same sections make it a crime for persons having charge of such a structure to refuse "to admit such officer, or to suffer him to examine such article." Subdivision (b), § 1501, tit. 26 U.S.C.A.

The Supreme Court of the United States treated this act as valid for the limited purpose where entry was refused to a bank, but sustained an objection to an information which did not clearly allege that taxable objects were in the bank at the time. The gist of the holding is as follows: "Viewed in the light of these suggestions, it is clear that the right conferred upon the officer to enter the building or place of business of another in such a case is strictly limited to a building or place of business in which articles or objects subject to taxation are, at the time of the proposed entry and examination, made, produced, or kept, and that paid bank-checks, unless it is alleged and proved that they were not duly and sufficiently stamped at the time they were made, signed, and issued, are not articles or objects subject to taxation within the meaning of the act of Congress on which the information is founded." United States v. Mann, 95 U.S. 580, 586, 587, 24 L. Ed. 531.

In a subsequent case these sections were adjudged applicable to a search for articles taxed under a subsequent statute. United States v. Barnes, 222 U.S. 513, 32 S.Ct. 117, 56 L.Ed. 291. The sections were given effect and no doubt indicated as to constitutionality prior to the passage of the Eighteenth Amendment in searches for taxable goods in buildings devoted to keeping or making of taxed articles of various sorts, including un-

stamped checks,[19] oleomargarine,[20] tobacco[21]. Validity was assumed in certain cases relating to intoxicating liquors prior to the passage of the Amendment.[22]

After the passage of the Eighteenth Amendment, many cases sustained searches under these sections,[23] but, on the other hand, there were doubts expressed as to the validity of the search under these sections where the problem was complicated by the question of the authority of the prohibition officer.[24] United States v. Two Soaking Units, 44 F.(2d) 650, 653 (D.C.), decides that the officers in acting under these sections laid no groundwork for future seizure but does not indicate that the sections were invalid or inapplicable. In some cases where the search was upheld, it was assumed that the plant was operating under a permit and therefore had waived a right to the application of the Fourth Amendment.[25] In others it is assumed that no revenue feature is involved and that the right to search under the sections referred to is therefore denied.[26] The opinion of United States v. Hilsinger (D.C.) 284 F. 585, 590, seems to have first suggested that a distinction was to be drawn between distilleries and breweries and other types of businesses, but the language of the section from the time of its adoption was general in its application to all structures where objects liable to tax were kept or manufactured as pointed out above. Referring to the codification of this section in the revised statute, the Supreme Court of the United States says: "Title 35 of the Revised Statutes * * * is a codification and consolidation, according to an orderly arrangement, of all the then-existing laws relating to internal revenue. It is subdivided into chapters, each embracing cognate sections bearing upon a particular branch of the general subject. The first two chapters, one dealing with the officers of internal revenue and the other with assessments and collections, are, with minor exceptions, general in their terms and application. The third chapter deals with 'special taxes' exacted of those who engage in designated classes of business, such as rectifying or selling distilled spirits and manufacturing or selling cigars; other chapters deal separately with specific taxes imposed upon particular articles or objects, such as distilled spirits and cigars, and the final chapter comprises provisions common to several objects of taxation." United States v. Barnes, 222 U.S. 513, 517; 32 S. Ct. 117, 56 L.Ed. 291.

The opinion in the Hilsinger Case likewise first intimated that a distinction was to be drawn between licensed and bonded breweries and distilleries, and others operated clandestinely. As will be seen by the history of the sections, there is no basis whatsoever for this attempted distinction. Furthermore, the point was not involved in the Hilsinger Case, since there the entry was upheld under the revenue acts containing these sections on the ground that the particular brewery was under license. However, the dictum was followed without examination in most of the cases cited above which, for one reason or another, denied validity to an entry made under these sections. Strangely enough, it was also followed in the case of United States v. One Kemper Radio (D.C.) 8 F.Supp. 304, where entry was attempted under these sections after repeal of the national prohibition amendment.

The Circuit Court of Appeals of this circuit in Alvau v. United States, 33 F. (2d) 467, 469, 470, said: "While we are

[19] United States v. Rhawn (1875) Fed. Cas.No.16,150; United States v. Mann (1877) supra.

[20] Kercheval v. Allen (C.C.A.8, 1915) 220 F. 262; United States v. Barnes (1912) supra.

[21] United States v. Mosely, Fed.Cas. No.15,823.

[22] United States v. Fears (1878) Fed. Cas.No.15,080.

[23] Carvalho v. United States, 54 F. (2d) 232 (C.C.A.1); In re Herter, 30 F.(2d) 968 (D.C.); Casey v. United States, 281 F. 897 (C.C.A.8). See United States v. Page, 277 F. 459, 461 (D.C.).

[24] In re Phoenix Cereal Beverage Co. (C.C.A.) 58 F.(2d) 953, 957; Cooper v. United States, 299 F. 483, 485, 486 (C.C.A.3). See United States v. Swan, 15 F.(2d) 598 (D.C.); United States v. Hilsinger (D.C.) 284 F. 585, 590; O'Connor v. Potter, 276 F. 32 (D.C.); United States v. Rabstein, 41 F.(2d) 227 (D.C.).

[25] United States v. Hilsinger (D.C.) 284 F. 585, 590, affirmed (C.C.A.) 2 F.(2d) 241; United States v. Westmoreland Brewing Co., 294 F. 735, 739 (D.C.).

[26] In re Phoenix Cereal Beverage Co., supra; Cooper v. United States, supra.

not to be understood as necessarily holding that the application of the statute is restricted to a registered still, and does not extend to a place avowedly or notoriously devoted to the distillery business, we are of the opinion that it does not authorize the forcible entry of a building, admittedly a private residence, where the circumstances within the knowledge of the officers tending to engender the belief that a still is being unlawfully operated therein are barely sufficient, in the most favorable view, to authorize a magistrate, upon being appropriately advised thereof, to issue a search warrant." This case arose while the national prohibition amendment was in effect and indicates that the court would have held the entry valid in the event that there had been a search of a detached distillery, whether licensed or not. Since the terms of the sections themselves do not seem to authorize the search of a dwelling house, the distinction made is founded on reason and valid, but it does not apply to this case.

The whole business of the distillation of liquors is now legal under certain conditions which effect the revenue of the government. By engaging in this business, whether the distillery is registered or not, the owner puts himself in a position where the premises occupied solely for that purpose are subject to entry in order to determine whether or not the operation is being carried on in accordance with the law. The taxing power of the government is involved, and certainly the statute which declares that the revenue officers have a right to enter for the purpose of collecting a tax cannot be unconstitutional. If a dwelling house were involved or if a distillery were operated in a dwelling house, it might well be that the courts would hold that the protection of the amendment was extended to it. But where a building is wholly devoted to an operation which the government taxes and which is illegal if the distillery is not registered or the production is untaxed, it would seem to place an aura of protection about an illegal operation and to stretch the terms of the Amendment too far to place this sort of a search without the pale.

The motion of the defendant Vlahos for suppression is denied. The court finds him guilty on all counts.

The defendant Karmones had no property in the articles seized nor in the lease. He was simply an employee, and therefore he had no right to have the evidence suppressed as to him. The motion to suppress on his behalf is denied and he is found guilty on all counts.

The motion of the defendant Wagner to suppress is likewise denied. The property seized was not his property, and he had leased the parcel upon which the distillery stood to Vlahos and it ceased to be his home by this act. The mere fact that the officers crossed his yard in order to get to the gate leading into these premises is of no value. In any event, even if the motion to suppress were sustained as to him, his admissions show that he leased the property to Vlahos, and the circumstances are sufficient to prove that he had notice of the illegal nature of the transaction and was a participant in certain phases thereof. The court finds him guilty on the conspiracy count and upon the count which charges an operation of a distillery without having given the bond as required by law.

Judgment of conviction as to the counts indicated will enter in accordance as to all defendants.