Morris E. ANGLIN, Jr., Appellee,

v.

DIRECTOR, PATUXENT INSTITUTION, Appellant.

No. 14583.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 4, 1971.

Decided March 29, 1971.

---

Alfred J. O'Ferrall, III, Asst. Atty. Gen., of Maryland (Francis B. Burch, Atty. Gen., of Maryland, on the brief), for appellant.

William John Giacofci, Baltimore, Md., for appellee.

Before HAYNSWORTH, Chief Judge and CRAVEN, and BUTZNER, Circuit Judges.

CRAVEN, Circuit Judge:

This appeal involves the exclusionary rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and the extent of the right to search and seize under a valid search warrant. Specifically, the question presented is whether stolen property, seized in the course of execution of a valid search warrant, but unrelated, as it turns out, to the offense under investigation, may be used as the basis for prosecution for other offenses. In proceedings under petition for a writ of habeas corpus, the district judge concluded that certain items offered as evidence at the state trial of the appellee, Morris E. Anglin, were the products of what he characterized as a general exploratory search, and were unreasonably seized in violation of the Fourth Amendment. We disagree and reverse.

I.

On November 1, 1965, the Baltimore County police began surveillance of the Anglin residence, a house trailer, because he was known to them as a professional burglar and was then suspected of burgling the residence of Mr. and Mrs. Ernest Fox [1] of Baltimore County. At that

---

1. An asserted accomplice, then in jail, had told police that Anglin burgled the Fox residence.

time Anglin was under indictment for another unrelated break-in for which he was subsequently convicted on November 17. On the evening of his conviction for the prior offense, two members of the Baltimore County police force went to the Anglin trailer and, being admitted, asked the appellee's wife for permission to search the premises for items taken in the Fox break-in. Although fully aware that her house had been under surveillance, she refused the officers' request for the stated reason that she feared what her husband would do to her if she consented. The police honored her refusal, left at once, and returned the next afternoon, November 18, with a search warrant describing generally, but with as much specificity as possible, 27 items from the Fox break-in thought to be in the trailer.[2] The sufficiency of the warrant is not in question.

Mrs. Anglin was presented with the warrant, read it, but not very carefully, and failing to distinguish between the Fox burglary then under investigation and others perpetrated by her husband, assumed it authorized the seizure of all stolen property in the trailer which, other than furniture, appeared to be most of its contents. She not only accepted the authority of the warrant, but proceeded to help matters. Presumably referring to the Fox burglary, the officers asked Mrs. Anglin to point out "anything that she knew to be stolen * * * to simplify matters." Mrs. Anglin "went to a small room with [Sgt. Donovan] and began taking clothing from a rack that contained many articles of women's clothing, fur coats and such, and handing them to me * * *. She handed us many articles of clothing, jewelry, appliances * * *." Mrs. Anglin described her actions:

A  I can remember saying something like "If there is anything here that doesn't belong to me" that they can take it. But the things that did belong to me, I didn't want them to take.

2. The search warrant described what was sought, as follows:

### STOLEN PROPERTY

| | Appr. Value |
|---|---|
| 1—Ladies Enamel watch bracelet (Swiss make) | $   25.00 |
| 1—Pair Zircon Earrings (White gold) | 45.00 |
| 1—Four Skin Russian Sable Scarf | 500.00 |
| 1—Full length Alaska Brown Seal Coat—M. Fox written on inside of body of coat | 1,400.00 |
| 1—Black Diamond Mink Stole with Double Collar (MKF initials) | 1,450.00 |
| 1—Mink Sides Fur Coat | 450.00 |
| 1—Black Ladies Suit with White Mink Collar | 200.00 |
| 1—Brown Ladies Suit with Oppossum Collar & Cuffs | 150.00 |
| 1—Black Ladies Coat with Black Mink Collar | 175.00 |
| 1—Black Ladies Coat with Black Mink Collar & Cuffs | 250.00 |
| 1—Gold Ladies Tweed Coat with Brown Mink Collar | 225.00 |
| 1—Ladies Mink Hat | 150.00 |
| 1—Genuine Leopard Covered Ladies Hand Bag (Hutzlers) | 150.00 |
| 1—Ladies Sheepskin Coat (England) | 85.00 |
| 1—Sony Micro T.V. Set—5″ Screen, Serial #10417, Model 5–303–W | 249.00 |
| 1—Tray of Miscellaneous men's items (gold penknives, studs, money clips, bar pins, etc.) | 35.00 |
| 4—New Men's Sport Shirts (gold, yellow, brown, green) | 25.00 |
| 1—Men's Gray Striped Topcoat (Cowens) | 65.00 |
| 1—Men's Gray Velvet Collar Top Coat (Hamburgers) | 75.00 |
| 1—Sweater with Multicolor Suede Front, Men's (Hamburgers) | 50.00 |
| 1—32 or 38 Cal. revolver, black handle | ??? |
| 1—Glass Money Bank ($5.95) Cash $30.00 | 35.95 |
| 1—Small 8 Transistor Standard AM–FM Radio—Standard | 40.00 |
| 1—Table Model AM–FM Transistor Radio (Black) | 59.00 |
| TOTAL VALUE: | $5,888.95 |

Q Alright. And you proceeded then, to separate your goods from what you didn't know belonged to you?

A No, I did not.

Q What did you do then? Tell us.

A I was walking back and forth in the trailer, trying to assist them as best I could.

Q You helped them?

A The things that I actually bought and paid for myself, I was trying to save.

With Mrs. Anglin's help, indeed at her "insistence",[3] the police finally took to headquarters and displayed over 700 items of property thought to have been stolen in numerous burglaries. Sergeant Donovan later testified about the search:

Q Now, the goods that you seized over and above those which were described in the original warrant, of what character and nature were they?

A Of the same character as those directed in the search warrant.

Q Now, did Mrs. Anglin do anything after the goods were carried out of the trailer?

A Mrs. Anglin came outside and I believe helped carry some of the stuff to the police vehicle.

At the police station the seized property was put on display and victims of break-ins in the Baltimore area were invited to come in and identify, if possible, their missing property. Anglin's convictions of which he complains were based upon the subsequent identification by

two such victims of items belonging to them.

The convictions were affirmed on appeal. Anglin v. State, 1 Md.App. 85, 227 A.2d 364 (1967).

## II.

This is a search warrant case. It is not a case of search and seizure incident to arrest. From the time of adoption of the Fourth Amendment until quite recently search warrants have been stepchildren of the criminal process—mostly ignored and neglected by the police.[4] The high water mark of search incident to arrest and without a search warrant was Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). In that case police spent five hours combing Harris' apartment for incriminating evidence and their activity was approved as incident to the arrest. After *Harris* it was quite clear that the obtaining of a search warrant was simply a handicap rather than a help, in most circumstances, and the wise policeman simply arranged to make the arrest at a place where incriminating evidence would likely turn up.

But the warrantless search incident to arrest has now been severely limited. In Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Court held that officers cannot search beyond the immediate area of an arrested suspect. The general exploratory search of an entire apartment or house, approved in *Harris*, as incident to arrest, was disapproved and *Harris* specifically overruled. The Court concluded that

3. The record unfortunately does not completely reveal the conversation between officers and Mrs. Anglin. Apparently misapprehending the hearsay rule (Mrs. Anglin was present) and one of its exceptions—that what Mrs. Anglin said to the officers was admissable, if not to prove the truth of the matter asserted, then for its impact and effect on the officers—the state judge did his best to prevent disclosure of the conversation. He succeeded pretty well in shutting off the officers' version of the conversation. But when Mrs. Anglin testified he was less successful. Her testimony and the truncated testimony of the officers makes pretty clear that she believed nearly everything was stolen and managed to convey her belief to the officers.

4. It has been said that until Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961), search warrants were almost unknown in New York City, and that in San Francisco as late as 1968 only 20 search warrants were obtained by police, 29 in Detroit, 17 in Wichita, Kansas, and approximately 30 in Milwaukee. *See* Graham, The Self-Inflicted Wound (1970).

"[t]he search went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him" and further concluded that "[t]here was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area." 395 U.S. at 768, 89 S.Ct. 2034.

■ We think the Court in *Chimel* has clearly indicated that searches without search warrants, even incident to arrest, are not favored, and, conversely, that in order to encourage police use of them, searches and seizures pursuant to a valid search warrant will carry a presumption of legality. But see, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

The police were clearly entitled under the search warrant to enter Anglin's trailer and to search for the 27 items of personal property particularly described in the warrant. Anglin may not properly complain of the search. He does complain of the seizure as a general seizure of property not particularly described in the warrant.

Anglin relies heavily upon Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969), and Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957), but neither is a search warrant case. In Von Cleef the Court found that a search conducted incident to a lawful arrest that resulted in "combing a three-story, 16-room house from top to bottom and carting away several thousand papers, publications, and other items [could not] under any view of the Fourth Amendment be justified. * * * " *Id.* 395 U.S. at 816, 89 S.Ct. at 2052. In *Kremen* the indiscriminate seizure of the entire contents of a cabin by FBI agents incident to an arrest was condemned as a general search.

■ The seizure in the Anglin trailer search was roughly similar in magnitude to the *Von Cleef* and *Kremen* seizures—some 700 items of personalty. But it is not how many items may be seized that determines validity of a search. The rule against general exploratory searches is not aimed against quantity, nor even designed to protect property quantitatively, but, instead, is designed to prevent *indiscriminate* searches and seizures that invade privacy. Mr. Justice Harlan noted in his concurrence in Von Cleef v. New Jersey, *supra*, that "Kremen simply prohibits the police from seizing the entire contents of a building *indiscriminately*, without considering whether the property they take is relevant to the crime under investigation; it does not bar the removal of *all* property that may reasonably be considered evidence of crime." 395 U.S. at 817, 89 S.Ct. at 2053. (Emphasis added.) Simply because the seizure in the Anglin search was of greater magnitude than the officers had anticipated, such occurrence should not force us to "exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions under constitutional protections." Terry v. Ohio, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968). The large seizure must be judged, rather, on the basis of whether it was an unreasonable extension of the valid power contained in the search warrant.

■ The officers were authorized entry upon the premises by the search warrant they had obtained and were duty bound to carry out their search in a thorough manner until the items listed in the warrant were found. We think the limits of the warrant were not exceeded by the officers despite the quantitative magnitude of the seizure as compared with the small number of items particularly described in the warrant.

Anglin would have us read the search warrant as a constitutional strait jacket: that only those items particularly described in it may be seized without regard to the facts and circumstances of the particular case. Principal reliance is placed upon Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). In that case prohibition agents

entered an establishment with a warrant authorizing the seizure of "intoxicating liquors and articles for their manufacture." They arrested several persons there, and while rounding up all of the items listed in the warrant, the agents found and seized a ledger and some bills used in the course of the illicit business. The contents of the ledger and bills were allowed into evidence at trial, the government on appeal justified their use as being seized either incident to the execution of the search warrant or seized incident to the arrests made. The Supreme Court would not sanction their seizure under the warrants:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

275 U.S. at 196, 48 S.Ct. at 76. But what was said was almost dictum for it was held that the evidence was lawfully seized as being incident to a lawful arrest.

Since *Marron* the Supreme Court has permitted the inferior courts to fashion various exceptions to the rigidly flat prohibition of the *Marron* language. See, e. g., Aron v. United States, 382 F.2d 965 (8th Cir. 1967); Seymour v. United States, 369 F.2d 825 (10th Cir. 1966); Porter v. United States, 335 F.2d 602 (9th Cir. 1964); United States v. Garris, 262 F.Supp. 175 (D.D.C.1966).

In *Seymour, supra,* Chief Judge Murrah, writing for the Tenth Circuit, had this to say:

> We know, of course, that the precise language of the Fourth Amendment requiring the search warrant to particularly describe "things to be seized" forbids "the seizure of one thing under a warrant describing another"—"nothing is to be left to the discretion of the officers executing the warrant." Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231]; Stanford v. State of Texas, 379 U.S. 476

[85 S.Ct. 506, 13 L.Ed.2d 431]; Harris v. United States, 10 Cir., 151 F. 2d 837, 169 A.L.R. 1413, affmd. 331 U.S. 145, [67 S.Ct. 1098, 91 L.Ed. 1399]. The constitutional mandate is implemented in Rule 41(e), F.R.Crim. P. But, notwithstanding the specificity of the constitutional prohibition, the courts have apparently recognized a narrow exception dictated by the practicalities of a particular situation as where in the course of a lawful search pursuant to a lawful arrest *or the execution of a valid search warrant the officer uncovers evidence of another crime.* In these circumstances the officer is not required to close his eyes to the realities of the situation. (Emphasis added.) 369 F.2d at 826–827.

Our conclusion in this case finds some support in the Court's recent rejection of the mere evidence rule, Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, and the Court's recent endorsement of the "plain view doctrine" in Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." *Id.* at 236, 88 S.Ct. at 993.

By virtue of the lawful warrant in their possession, the officers searching the Anglin trailer had a "right to be in the position" to observe the entire contents of the trailer. Those items seized were discovered in the course of a lawful search. The testimony of Sergeant Donovan indicates that, in fact, many of the items were not only in plain view, but were thrust upon them by Mrs. Anglin. Once the privacy of the dwelling has been lawfully invaded, it is senseless to require police to obtain an additional warrant to seize items they have discovered in the process of a lawful search. "There is no war between the Constitution and common sense." Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961). To so hold would

again tempt the police to proceed without a warrant, for even now searches incident to arrest are not so confined. Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L. Ed.2d 1067 (1968). If the search has not extended beyond the scope of the warrant and the officers chance upon items which they would have had probable cause to seize in the course of arrest, we think it serves the Fourth Amendment well to allow the seizure of those items for use as evidence at trial. See, United States v. Eagleston, 417 F.2d 11 (10th Cir. 1969); United States v. Teller, 412 F.2d 374 (7th Cir. 1969). To hold otherwise will again put a premium on search incident to arrest at the expense of the warrant procedure contemplated by the amendment itself. As Judge Learned Hand remarked in a pre-*Marron* decision: "Once in, the question is whether the officer's added seizure was 'unreasonable' under the Fourth Amendment." United States v. Old Dominion Warehouse, 10 F.2d 736, 738 (2d Cir. 1926).

Whether viewed in terms of probable cause or reasonableness, we think on the facts of this case the police officers had a duty to seize and take into protective custody the 700 items of personalty that were subsequently put on display at the Baltimore Police Station. Our conclusion is derived from these factors, which taken together are sufficient to make us think that such a seizure was not unreasonable under the Fourth Amendment:

Anglin was a known burglar. His status as such did not rest upon mere suspicion, but was established by prior convictions.

The police had been informed by an alleged accomplice that Anglin had broken into the Fox home. They had been furnished a list of property stolen from that home. See footnote 2, *supra*. Personalty is not easily described on paper. It is not possible to take the list of stolen property "particularly described" in the warrant and positively identify items of personalty against it. Ladies' enamel watch bracelets have a way of looking alike except to the true owner, and the same is true of zircon earrings (white gold). A mink sides fur coat may be unique to the woman who bought it, but to a police officer not clearly distinguishable from an Alaska brown seal coat. When items similar to those described in the warrant are thrust upon police by the wife of a known burglar who clearly conveys her intention to keep only items that were not stolen, we think the police would have been derelict in their duty had they refused to seize the property. It is true that the police entered the Anglin trailer for the purpose of investigating the Fox burglary and attempting to solve it. But police also have a duty to protect property and to make a reasonable effort to return property apparently stolen to its true owners. It is absurd to suggest that under these circumstances the Fourth Amendment required police to inform Mrs. Anglin that she would have to keep all of the property whether it belonged to her or not.

■■ We reject Anglin's contention that his wife's cooperation with police officers was coerced. Mrs. Anglin indicated her independence of spirit by declining permission to make the search without a warrant and by requiring the police to get one before she would acquiesce. Compare Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L. Ed.2d 797 (1968), where there was acquiescence to the police claim of having a warrant (it was never produced) and the Court was concerned with intimidation. To say that the Anglin search was coerced is simply to admit the validity of the warrant, for that is its very purpose. Once the search is lawfully begun, the police may reasonably ask the help of anyone present to aid them in finding the property described in the warrant, and if help is forthcoming it is not constitutionally suspect. We think it does not matter whether Mrs. Anglin may have thought she had a citizen's

duty to separate the stolen from the lawfully owned property or was motivated by her own desire to save what belonged to her.

We agree with what Judge Orth of the Court of Special Appeals of Maryland said about the reasonableness of the enlarged seizure.

> The articles seized were of the same nature and substance as those described in the warrant. With this knowledge and confronted with the great array of merchandise, literally enough to stock a store, we do not feel that justice requires the police officers to close their minds and eyes. We think there was more than reasonable cause for them to believe the property was stolen. Appellant maintains that he could have been a watch salesman or clothing salesman or that there are other logical explanations to account for the property other than it was stolen. We think this incredible under the circumstances as did the trial court.

Anglin v. State, 1 Md.App. 85, 91, 227 A. 2d 364, 367 (1967).

Since the district court did not reach two other claims presented by Anglin in his petition for writ of habeas corpus, neither do we.

Reversed and remanded.