UNITED STATES of America

v.

Stanley WOLFE et al.

Crim. No. 73-650.

United States District Court,
E. D. Pennsylvania.

April 26, 1974.

Thomas A. Bergstrom, Asst. U. S. Atty., Philadelphia, Pa., for the United States.

Donald J. Goldberg, Philadelphia, Pa., for defendants Wolfe.

## OPINION AND ORDER

HANNUM, District Judge.

Presently before the Court is the motion of defendants Stanley Wolfe and Nathan Wolfe to suppress evidence. Following a hearing on the motion, the Court took the motion under advisement. The defendants, in their memorandum submitted to the Court, cite four reasons in support of their motion. We shall consider each of these contentions in turn.

### WAS THE AFFIDAVIT UPON WHICH THE WARRANT WAS ISSUED FOR THE SEARCH OF THE PREMISES AT 3226 W. CHELTENHAM AVENUE SUFFICIENT TO JUSTIFY THE FINDING OF · PROBABLE CAUSE?

On March 21, 1973, U. S. Magistrate Naythons issued a search warrant for the premises at 3226 W. Cheltenham Avenue, Philadelphia, Pennsylvania, based upon an affidavit of March 2, 1973 by Special Agent Ramsey of the F. B.I. pursuant to Rule 41(e) Fed.R. Crim.P. The defendants attack the affidavit of Agent Ramsey as failing to state sufficient probable cause for the issuance of a search warrant.

The Fourth Amendment states:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Before commencing an inquiry into the sufficiency of the affidavit, it is important to note the presumptions with which courts are directed to approach such an examination:

" . . . that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96 [85 S.Ct. 223, 228, 13 L.Ed.2d 142] (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U.S. 300, 311 [87 S.Ct. 1056, 1062, 18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 108 [85 S.Ct. 741, 745, 13 L.Ed.2d 684] (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270–271, [80 S. Ct. 725, 735–736, 4 L.Ed.2d 697] (1960)." [1]

Moreover, in determining whether there was sufficient probable cause for the issuance of the search warrant the Court must look to the affidavit in its entirety. If the affidavit, reviewed as a whole, discloses the existence of probable cause, then the Government has met its burden. United States v. McNally, 473 F.2d 934 (3d Cir. 1973); United States v. Singleton, 439 F.2d 381 (3d Cir. 1971).

The affidavit submitted to the magistrate in the present case does provide sufficient grounds for a finding that probable cause existed to search 3226 W. Cheltenham Avenue. The affidavit contains the following facts and circumstances which justify a probable cause belief that Title 18 U.S.C. §§ 659 and 2314 have been violated by the defendants and the fruits of those alleged crimes will be found on the premises sought to be searched, 3226 W. Cheltenham Avenue, which is a one story brick

---

1. Spinnelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

building where Stanley and Nathan Wolfe do business.

Volume Merchandise Incorporated is located at 75 9th Ave., New York City and they sell ladies' and children's wearing apparel. The records of Volume Merchandise reflect that they do not sell or buy from Stanley Wolfe on Cedarbrook Fashions (the name the Wolfes do business under).

On February 20, 1973, F.B.I. agents observed approximately 25 to 30 boxes of what appeared to be Volume Merchandise Inc. merchandise being unloaded from a Ford Econoline truck into the premises at 3226 W. Cheltenham Avenue.

On February 22 and 26, 1973, F.B.I. agents observed the same Ford Econoline truck in the Jo-Jon Trucking lot in New York where the driver removed merchandise from a shabby trailer located on one side of the lot and delivered it to 3226 W. Cheltenham Avenue in Philadelphia. This merchandise was also marke Volume Merchandise Inc.

During the period from February 21 to February 27, 1973 electronic surveillance revealed that the defendants made several calls to various persons attempting to sell merchandise under style numbers which belong to Volume Merchandise Inc. that is, Volume Merchandise Inc. handles style numbers identical to those which the defendants were attempting to sell.

On February 28, 1973, F.B.I. agents found a discarded carton, number 279817, belonging to Volume Merchandise Inc., behind the premises at 3226 W. Cheltenham Avenue. That same carton had been consigned to interstate shipment during the period of February 19 through February 24 to a store in Harrisburg, Virginia.

On March 1, 1973, a carton from Volume Merchandise Inc., number 570, was observed being carried into 326 W. Cheltenham Avenue. It has been learned that carton number 570 was consigned from Volume Merchandise Inc. destined for a store in Knoxville, Tennessee, and that Volume Merchandise had made shipments to the Knoxville store during the past week.

On March 1, 1973, electronic surveillance revealed a conversation between defendant Stanley Wolfe and an individual named Middleton concerning an inquiry regarding stolen merchandise. The defendants stated that they would deny the allegation and that they did not want "them in the place" and that certain "measures" should be taken.

The affidavit also makes reference to the fact that in a telephone conversation monitored by F.B.I. electronic surveillance one of the defendants requested shirts with no labels. Also, color-coded shipping materials were seen being delivered to 3226 W. Cheltenham Avenue and matching the color coding system of Volume Merchandise Inc.

The above outlined facts taken from the affidavit give rise to a finding of probable cause that Volume Merchandise Inc. shipments have been unlawfully diverted in some manner and are being received by the defendants at 3226 W. Cheltenham Avenue, Philadelphia. The observation of Volume Merchandise Inc. merchandise being carried into that location certainly justifies a search warrant for those premises.

The defendants argue that the affidavit does not contain any report by Volume Merchandise Inc., or those to whom it sold merchandise, that any part of Volume Merchandise Inc.'s shipments were stolen. However, as the Government points out, the specific merchandise referred to was stolen during the same week that Volume Merchandise Inc. consigned it and shipped it to other individuals. At that early stage of the investigation, it would have been impossible for them to know of their own knowledge whether or not the merchandise had reached its legitimate destination. A common sense reading of the affidavit does reveal the requisite probability of criminal activity that is the standard of probable cause. Beck v. Ohio, *supra*.

## WAS THE AFFIDAVIT UPON WHICH THE SEARCH WARRANT WAS ISSUED SO FALSE AND MISLEADING AS TO INVALIDATE THE WARRANT?

The Court has decided that the affidavit was sufficient on its face. Nevertheless, the defendants next contend that the information included in the search warrant affidavit to convince the U. S. Magistrate that there was probable cause to believe the Wolfes were dealing in stolen merchandise, was so untrue and misleading as to invalidate the search warrant.

At the hearing on Motion to Suppress, the affiant, F.B.I. Agent Ramsey, stated that he was in charge of the investigation of Stanley and Nathan Wolfe. Agent Ramsey secured a Court Order permitting a tap on the Wolfes' telephones and he was in regular contact with the monitoring agents in order to ascertain whether there was anything passing over the telephones that would indicate that criminal activity was going on. Agent Ramsey determined which of the intercepted calls should be transcribed for possible use in Court.

The section of the affidavit in support of the search warrant which is attacked by the defendants, appears on page five and states as follows:

"On March 1, 1973, electronic surveillance revealed that an individual named Middleton spoke with Stanley Wolfe. Middleton identified himself as calling from S. E. Nichols and Company. Middleton told Wolfe that FBI agents were making inquiry at their Harrisburg, Virginia Store regarding certain merchandise that came from a hi-jacked truck. Middleton told Wolfe he thought the shipment had come from Stanley Wolfe. Wolfe told Middleton he could not recall having sold that brand to Middleton. Afterward, Stanley Wolfe called an individual named Nate and advised him of the conversation with Middleton. Nate told Stanley he could not remember selling the particular brand in question to S. E. Nichols and Company. Stanley Wolfe told Nate that Middleton said if the FBI came to Nichols, Middleton would show them the records. Stanley Wolfe said that 'We will just deny it'. Nate said 'That's right but the only thing is, I don't want them in the place'. Stanley asked who and Nate answered 'those people'. Nate asked 'Well how are you going to work that out?' Stanley replied, when Middleton informed them of the stores particulars Nate should take 'measures'."

The defendants point out that untranscribed by the F.B.I. and unmentioned in the search warrant affidavit was a second call (Exhibit D–7) on the same day from Middleton to Stanley Wolfe in which Middleton informed Wolfe that the stolen merchandise referred to in the earlier call had not come to him from the Wolfes but from someone else. During his testimony, agent Ramsey stated that he was aware of the second call from Middleton to Stanley Wolfe on March 1, 1973, and that in preparing the search warrant affidavit he included only the first call from Middleton to Wolfe (N.T. p. 52). Agent Ramsey offered the following explanation:

"Q. Right; so that when you prepared this search warrant affidavit and put in the first call from Middleman to Wolfe, you deliberately omitted the second call from Middleman[2] to Wolfe; am I correct, sir?

A. For a very specific reason.

Q. What was that, sir?

A. Not only was there a call where Stanley Wolfe was being accused of having sold stolen merchandise, there was very, very much in there on Stanley Wolfe's part that he didn't know whether he had sold him stolen merchandise or not, that he was afraid that he had and that he will deny it if he did, and for the simple fact

2. The affidavit for the search warrant refers to the individual as "Middleton".

that it would indicate that he was having stolen merchandise. Whether this was a particular piece was stolen or not Stanley didn't know." (N.t. p. 52–53).

Agent Ramsey's testimony that he believed that Stanley Wolfe was involved in handling stolen merchandise is reasonable when one considers all the circumstances involved.

The first conversation Stanley Wolfe had with Middleton (Exhibit D–1–A) is extremely interesting in content, since in it Middleton is actually forewarning Stanley Wolfe of a possible F.B.I. investigation regarding the stolen merchandise. In fact, "forewarn" is precisely the term Middleton uses during the conversation with Stanley Wolfe in apprising him of the suspected stolen merchandise. During the conversation, Stanley Wolfe explains to Middleton that Middleton should not give the F.B.I. access to his records and should not honor any possible subpoena for records that may be forthcoming.

Stanley Wolfe then informs his brother Nathan of the Middleton call and the two discuss the Middleton situation at some length, and the possibility that they could have sent some of the articles to Middleton at one time. The conversation concludes with the following:

"SW [Stanley Wolfe] Well, I'll tell you, we'll just deny it.

NW [Nathan Wolfe] Of course, there's no record . . .

SW That's right, we'll just deny that we didn't send him anything.

NW Yeah, we have job lot bills, don't we?

SW For what"

NW For merchandise! From Elite, from different people.

SW Just from that sales company. (Laughter)

NW Yeah.

SW Well, uh, why should we, we didn't send him anything, I mean we can deny we sent him anything like that.

NW That's right, but the only thing is I don't want them in the place, that's all.

SW Who?

NW Those people.

SW Well, naturally.

NW Well, how are you going to work that out?

SW Well, when he tells you, you keep in touch with him, what the story is . . . then you take measures, you know what I mean?

NW Right, oh well, we'll worry about it when the time comes." (Exhibit D–1–B)

Nathan's statement to Stanley that he did not want "those people" in the place appears to be an obvious reference to the F.B.I.

■ Thus, based on the foregoing conversations, Agent Ramsey believed that Stanley Wolfe was involved with stolen merchandise. However, the question before the Court is whether Agent Ramsey's failure to include or mention the second call from Middleton in the affidavit is fatal to the search warrant. Most recently, in United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973), the question of misrepresentation appearing in affidavit was considered. The Court stated:

"Evidence should not be suppressed unless the trial court finds that the government agent was either recklessly or intentionally untruthful. A completely innocent misrepresentation is not sufficient for two reasons. Most importantly, the primary justification for the exclusionary rule is to deter police misconduct . . . and good faith errors cannot be deterred. Furthermore, such errors do not negate probable cause."

In another recent case, United States v. Thomas, 489 F.2d 664 (5th Cir. 1973) the Court stated that:

" . . . affidavits containing misrepresentations are invalid if the error (1) was committed with an intent to deceive the magistrate, whether or

not the error is material to the showing of probable cause; or (2) made non intentionally, but the erroneous statement is material to the establishment of probable cause for the search." 489 F.2d at 669.

In the present case, whereas Agent Ramsey's failure to include the second Middleton call (D–7) might be viewed as an error, it was not a wilful falsification of the facts, nor does it appear to have been committed with an intent to deceive the magistrate. Preparing an affidavit, as Agent Ramsey did here, is by nature a selective process and surely an affiant could not be expected to include everything that transpired. Agent Ramsey was confronted with the main issue of whether or not there was probable cause to believe that Stanley Wolfe was handling stolen merchandise, not specifically whether Stanley Wolfe had sold stolen merchandise to Middleton. When reviewed in their entirety, conversations D–1–A and D–1–B support that proposition and are referred to in Agent Ramsey's affidavit. Thus, it would appear that even if conversation D–7 had been included there would have been probable cause to believe Stanley Wolfe was handling stolen merchandise.

Additionally, in this regard, Agent Ramsey testified that " . . . Stanley Wolfe, to me, indicated that he was handling stolen merchandise as a result of that telephone call, and I felt like that should be in there." N.T. p. 53. In United States v. Carmichael, *supra,* it is stated:

"If an agent reasonably believes facts which on their face indicate that a crime has probably been committed, then even if mistaken, he has probable cause to believe that a crime has been committed. Such errors are likelier and more tolerable during the early stages of the criminal process, for issuance of a warrant is not equivalent to conviction."

WAS THE F.B.I. AGENT'S ACTION IN COPYING A FEDERAL PROBATION REPORT FOUND DUR-ING THE SEARCH OF DEFENDANTS' PREMISES A SEIZURE BEYOND THE SCOPE OF THE SEARCH WARRANT AND IN VIOLATION OF THE FOURTH AMENDMENT?

The search of defendants' premises was conducted pursuant to a search warrant (Exhibit D–6–A) which authorized the seizure of a variety of articles of clothing and "sales receipts, bills of lading, cancelled checks, business records, invoices, which records indicate the illegal business described in the affidavit attached hereto." In the course of the search, Agent Ramsey found a xerox copy of a federal probation report concerning one Mario Stracuzza, a New York resident. Because of the apparent suspicious nature of this discovery: Stanley Wolfe's possession of a copy of another's federal probation report, and because he "felt this individual may be connected with him in some way in perpetrating the thefts," (N.T. p. 62) he copied the report. As a result of what Agent Ramsey copied from the probation report, the F.B.I. was later able to identify Mario Stracuzza as the individual called "Harry" in the intercepted telephone conversations. Defendants seek to suppress as evidence against them the identification of Mario Stracuzza as "Harry", all testimony pertaining to Mario Stracuzza and any other evidence which derives from the initial copying of the probation report on the ground that such copying constituted an unlawful seizure which was beyond the authorization of the search warrant.

The Fourth Amendment says in pertinent part, " . . . no Warrant shall issue, but upon probable cause . . ., and particularly describing the place to be searched, and the persons or things to be seized." Thus, the general rule is that items not mentioned in the warrant may not be seized. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 1016 (1927). In *Marron,* the Supreme Court stated:

"The requirement that warrants shall particularly describe the things to be

seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." 275 U.S. at 196, 48 S.Ct. at 76.

■■ The Court in Anglin v. Director, 439 F.2d 1342, 1347 (4th Cir. 1971) stated that what was said in the *Marron* opinion "was almost dictum for it was held that the evidence was lawfully seized as being incident to a lawful arrest." 439 F.2d at 1347. The Court in *Anglin* refused to "read the search warrant as a constitutional strait jacket," *Id.* at 1346, and held that:

"Since *Marron* the Supreme Court has permitted the inferior courts to fashion various exceptions to the rigidly flat prohibition of the *Marron* language. See e. g., Aron v. United States, 382 F.2d 965 (8th Cir. 1967); Seymour v. United States, 369 F.2d 825 (10th Cir. 1966); Porter v. United States, 335 F.2d 602 (9th Cir. 1964); United States v. Garris, 262 F.Supp. 175 (D.D.C.1966)." *Id.* at 1347.

Thus, there are certain exceptions to the general rule that unspecified items may not be seized. For example, if during a lawful search the police legitimately come upon instrumentalities and means by which a crime is committed, the fruits of a crime such as stolen property, weapons by which escape of a person arrested might be effected, or property the possession of which is a crime, they can seize such material whether it is described in the warrant or not. United States v. Joseph, 174 F.Supp. 539 (E.D. Pa.1959), aff'd. 278 F.2d 504 (3 Cir.), cert. denied 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52. Another exception to the general rule that unspecified items may not be seized, and of particular application here, is that it is permissible to seize things other than those described in the search warrant if they have a reasonable relation to the purpose of the search. United States v. Joseph, *supra*;

United States v. Russo, 250 F.Supp. 55 (E.D.Pa.1966); Taylor v. State of Minn., 342 F.Supp. 911 (D.Minn.), aff'd. 466 F.2d 1119 (8th Cir. 1972); United States v. Kane, 450 F.2d 77 (5th Cir. 1971) cert. denied, 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810.

■ In the present case, it was permissible to copy the probation report, although the probation report was not described in the search warrant, since the probation report had a reasonable relation to the purpose of the search. The affidavit in support of the warrant indicates that the investigation included the use of a Court-authorized electronic surveillance. On five separate occasions the affidavit discloses that the defendants are dealing with an unidentified individual known to them as Harry. Moreover, the affidavit discloses that many of the participants in the enterprise described in the affidavit were unknown to the affiant at the time of the search. Even though the search warrant itself does not specifically describe the document or information seized, it would be a logical extension of that warrant, since it could lead to the identification of other individuals involved in the alleged criminal activity.

The defendants rely on United States v. Gray, 484 F.2d 352 (6th Cir. 1973). In that case, there was a search warrant directing the seizure of any intoxicating liquors and manufacturing apparatus. During the course of the search, one of the officers noticed two rifles in the residence. The officer copied the serial numbers of the weapons and then returned them to where they had been found. Thereafter, the officer ran the serial numbers taken from the rifles through a crime information computer and learned for the first time that they had been stolen. The defendant was charged with violating the federal fire arms law and was convicted. On appeal, the defendant argued that the officer's action in copying down the serial numbers pursuant to a warrant directing seizure of alcoholic beverages was in vi-

olation of the Fourth Amendment. The Court of Appeals agreed, and reversed and remanded the case.

The *Gray* Court recognized the general rule of Marron v. United States, *supra* that warrants particularly describe the things to be seized and that when a search is carried out pursuant to a warrant, the search must be limited in scope, not general or exploratory. The *Gray* Court also recognized another exception to the general rule that unspecified items may not be seized, namely, the plain view doctrine which permits an officer conducting a legal search to seize a piece of evidence incriminating the accused which is beyond the scope of the original warrant where it is immediately apparent to the officer that he has incriminating evidence before him. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

The *Gray* Court reasoned that since the rifles were not incriminating evidence at the time the officer copied down the serial numbers, this police action could not be sanctioned under the plain view doctrine. The *Gray* case is clearly distinguishable, however, from the present case. In *Gray*, the seizure of the weapons which were not clearly incriminating, and could not be justified as a logical extension of the liquor violations, was clearly beyond the scope of the warrant. In the present case, one might note that possession of someone else's federal probation report is suspicious in itself. Furthermore, it was not unreasonable for Agent Ramsey to believe that the individual named in the probation report might be one of unidentified individuals mentioned in the affidavit. Moreover, rather than dealing with two distinct crimes as in the *Gray* case here we are concerned basically with one crime.

Even assuming *arguendo*, that the requirements of the plain view doctrine are not met here, that is to say, it was not immediately apparent to the agent that he had incriminating evidence before him, the defendants' motion to suppress with respect to the copying of the probation report should not be granted. We have already noted above that a search on a warrant may extend to items reasonably related to the purposes of the search, and gaining evidence as to the possible identity of unknown individuals mentioned in the affidavit is reasonably related to the purpose of the search.

## WAS THE WARRANTLESS SEARCH OF THE TRASH IN DEFENDANTS' BACKYARD AND THE REMOVAL THEREFROM OF AN EMPTY PAPER CARTON A VIOLATION OF THE FOURTH AMENDMENT?

It was agreed to by counsel,[3] that on February 28, 1973, at night, an F.B.I. agent went into the alleyway behind 3226 W. Cheltenham Avenue and removed a cardboard carton marked "Volume Merchandise Inc." from the trash located in the defendants' backyard. There was no search warrant for the search and seizure and the defendants argue that a search of their "backyard trash" is protected by the Fourth Amendment. Accordingly, the defendants claim that the evidence seized from the trash and all evidence derived therefrom must be suppressed.

The government argues basically two theories which it claims support the conclusion that this evidence taken from the trash does not come within the Fourth Amendment's protection. The government believes it's preposterous to assume that one has an expectation of privacy in discarded garbage or trash which has been placed outside the premises of the residence or business. In Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the Supreme Court stated that before a Fourth Amendment protection can be involved, the defendant must have had some ex-

3. N.T. pp. 69–70.

pectation of privacy in that which is searched.

The second theory relied on by the government is that of abandonment. The government argues that to move undesirable garbage or trash from within the premises to without, where it is normally collected, is to discard it forever. The government urges that abandonment did occur here, and that the defendants do not have standing to raise the issue of the trash search. Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

■■ The Fourth Amendment provides for "the right of the people to be secure in their persons, houses, papers, and effects." The word "houses" in the Fourth Amendment has been extended by the Courts to include the curtilage. Fullbright v. United States, 392 F.2d 432 (10th Cir. 1968). Thus, the enclosed area surrounding a dwelling place is part of the protected premises. In United States v. Minker, 312 F.2d 632 (3d Cir. 1962), cert. denied, 372 U.S. 953, 83 S.Ct. 952, 9 L.Ed.2d 978 (1963) the Court stated:

> "Whether a given area is within the protected curtilage of one's dwelling depends upon a number of factors, including its proximity to the dwelling, whether it is within the enclosure surrounding the dwelling, and its use as an adjunct to the domestic economy of the family. . . . Of course, factors of paramount importance in considering a Fourth Amendment claim are the nature of the individual's interest in and the extent of the claimed privacy of the premises searched . . . . " 312 F.2d 632 at 634.

In the *Minker* case, it was decided that a tenant who lived in a second floor apartment and who deposited trash in a receptacle located on the premises but outside the building, had not only abandoned the property but, in addition, that the trash can was located outside an area which would entitle him to constitutional protection.

A trash can under the defendant's house has been held to be within the protected area, Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660 (1957) as has a barn, Steeber v. United States, 198 F.2d 615 (10th Cir. 1952), but not a hog shed, Thomas v. United States, 154 F.2d 365 (10th Cir. 1946), nor an open field, 50 to 100 yards from defendant's house, Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L. Ed. 898 (1924) nor a garage, Carney v. United States, 163 F.2d 784 (9th Cir. 1947). Also, the lobby of a multitenanted apartment building has been held to be not within the curtilage of the individual tenants. United States v. Miguel, 340 F.2d 812 (2nd Cir.) cert. denied, 382 U.S. 859, 86 S.Ct. 116, 15 L.Ed.2d 97 (1965).

The premises at 3226 W. Cheltenham Avenue is a one story building connected to several buildings in a small shopping center. It is bordered on the east side by Ivy Hill Valet Service and on the west side by Aetna Financial Service.[4] Stanley and Nathan Wolfe do business at the location under the name of Cedarbrook Fashions.[5]

■ Curtilage, discussed above, means a small piece of land, not necessarily enclosed, around a dwelling house and generally includes buildings used for domestic purposes in the conduct of family affairs; the term has no application to any building not used as a dwelling. In re Burgoons Estate, 80 Ohio App. 465, 76 N.E.2d 310, 312 (1946); Turknett v. State, 36 Okl.Cr. 401, 254 P. 985, 986 (1927).

■ Whereas, the term "house" within the Fourth Amendment may include a business office or store, Lanza v. State of N.Y., 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), the concept of curtilage does not apply to buildings other than dwellings. United States v.

---

4. Search Warrant Affidavit p. 6.

5. Memorandum of Defendants Wolfe In Support Of Motion To Suppress Evidence. p. 11.

Hayden, 140 F.Supp. 429 (D.C.Md.1956). Thus, the backyard of the defendants' business premises would not be afforded the same protection as part of the curtilage of a dwelling.

In the venerable case of United States v. Vlahos, 19 F.Supp. 166 (D.C.Or.1939), the Court stated:

"It is certainly true that a detached building or a place of business cannot be searched without a warrant when there is no evidence that any one is inside even though indications of the existence of crime are evident. A reconciliation of the diverse holdings can be made upon the ground that a dwelling house has a curtilage while a detached building, manufacturing plant, or other structure has none. The word 'curtilage' from its origin has denoted only the inclosure surrounding a dwelling house." 19 F.Supp. 166 at 170.

Thus, it may be concluded that the Fourth Amendment does not cover a business establishment with the same degree of protection against warrantless searches and seizures as that afforded a bona fide dwelling. People v. Sperber, 40 Misc.2d 13, 242 N.Y.S.2d 652. Aff'd. 15 N.Y.2d 566, 254 N.Y.S.2d 538, 203 N.E.2d 219. As it was stated in Monnette v. United States, 299 F.2d 847 (5th Cir. 1962), "A business establishment [is] not entitled to the same degree of privacy as a bona fide dwelling." 299 F.2d 847 at 851.

Moreover, it may not be validly argued that the F.B.I. agents could have obtained a search warrant, for the test is not whether it was reasonable to procure a search warrant but whether the search itself was reasonable, which it was. United States v. Edwards et al., 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

Accordingly, the motion to suppress evidence of the defendants Wolfe is denied.