COMMONWEALTH *vs*. JAMES C. BOND.

Middlesex. February 6, 1978. — May 10, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Search and Seizure. Constitutional Law,* Search and seizure.

A search warrant was properly issued on the basis of an application by a
    security representative of a telephone company and his supporting af-
    fidavit where an assistant attorney general was present in person with
    him, thus giving clear official sponsorship to the application. [204-206]
A seizure by police of articles not described in a search warrant but
    discovered while the police were properly executing the warrant was
    valid where the articles were either contraband or instrumentalities of
    committing a crime. [206-209]
The burden of proof was properly placed on a defendant challenging the
    validity of a search warrant on the ground that it was obtained by an
    improper applicant. [210]
In the circumstances and setting of a defendant's possession of a handgun,
    the defendant was not exempted from the requirement that he have a
    firearm identification card for the weapon by the fact that he held a
    Federal firearms dealer's license. [210]

COMPLAINTS received and sworn to in the Second District
Court of Eastern Middlesex, one on August 29, 1974 and
two on October 21, 1974.

INDICTMENTS found and returned in the Superior Court
on September 6, 1974.

A pretrial motion to suppress evidence was heard in the
Superior Court by *Leen*, J., and the cases were heard by
him.

After review was sought in the Appeals Court, the
Supreme Judicial Court on its own initiative, ordered direct
appellate review.

*Angelo Catanzaro* for the defendant.

*Bernard Manning,* Assistant Attorney General, for the
Commonwealth.

KAPLAN, J. Convicted in District Court on complaints for possession of an instrument designed for obtaining telecommunication service fraudulently (G. L. c. 166, § 42B), possession of marihuana, a controlled substance (c. 94C, § 34)[1] and possession of a firearm without obtaining a firearm identification card (c. 140, § 129C), the defendant took his appeals to the Superior Court for trial de novo. The defendant had also been indicted for possessing unlawfully intercepting devices (c. 272, § 99 C 5), and possessing burglarious implements (c. 266, § 49). Trial of these indictments was joined with the appeals. The judge, trying jury waived, found the defendant guilty of all five offenses. He fined the defendant a total of $1,562.50 on the three complaints, and on the indictments imposed concurrent sentences of one year's imprisonment in a house of correction suspended for three years, with probation for an equivalent period.

On the present review in this court of the judgments of conviction, the defendant centers his attack on the trial judge's denial of his motion to suppress materials seized by the Commonwealth. He contends that there was irregularity in the issuance of the warrant initiating the search by which the Commonwealth obtained these articles. But if the warrant was properly issued, the defendant urges that the seizure exceeded the authority of the warrant, and that the judge in all events erroneously cast the burden of proving illegality on the defendant. Besides raising these issues about the search, the defendant says with regard to the firearm conviction that he was exempted from the requirement of an identification card because the possession was necessary for his operation as a federally licensed firearms "dealer." These are the only contentions made.

The witnesses heard on the motion to suppress were the person on whose affidavit a search warrant issued, officers who participated in the search, and the defendant. Interrogation was full and rather less formal than would normal-

---

[1] The complaint was for possession with intent to distribute.

ly occur before a jury. The judge made written findings responsive to the proof and this we summarize.

On August 28, 1974, J. Walter Kiley, accompanied by an assistant attorney general, appeared before a judge of the Superior Court and swore an affidavit as follows. Kiley was a "security representative" of the New England Telephone and Telegraph Company in Boston, qualified in electrical engineering with particular reference to telephone transmissions. Commencing in May, 1974, information reached him that an unusually large number of calls, most of them of uncommonly long duration, had been made to toll-free numbers from a telephone listed to the defendant at 173 Willow Street, Waltham. This suggested that the caller might be obtaining telephone service fraudulently. Kiley arranged for the surveillance of the suspected telephone source through a mechanical monitor (a checking procedure permitted by 18 U.S.C. § 2511[2][a][i] [1970], and G. L. c. 272, § 99 D 1 a). The monitoring established that on eleven occasions the caller, after dialing a toll-free number, had caused a "2600 Hertz tone" to be emitted which enabled the caller to reach a long distance commercial number other than the toll-free number and to evade billing for it. Kiley averred that in all likelihood the emissions were actuated by an electronic instrument called a "blue box" placed on the telephone line or close to the telephone transmitter. Kiley concluded that there was probable cause to believe that a blue box or boxes and other described paraphernalia would be found concealed in the defendant's apartment on the first floor of 173 Willow Street.

On the submission made, the judge on August 28 signed a search warrant which, following the affidavit, directed search at the premises mentioned for blue boxes and any other equipment or material by which the 2600 Hertz tone could be generated, including plans or publications relating to the operation of a blue box. The wording of the warrant is set out in the margin.[2]

---

[2] The relevant language was: "a device or devices known as a 'blue box', or a tape recording or tape recordings containing a 2600 Hz tone and

State troopers connected with the organized crime section of the Attorney General's office executed the warrant the same afternoon. One or more of the officers were knowledgeable in electronic devices; and one or more were acquainted with the defendant, a former private detective who had been refused a renewal of his license to practice.[3] When the officers demanded entrance under the warrant, there was no response, and the door was therefore forced. The place was in considerable disarray. The defendant was in bed, and two other persons were also present. Search was undertaken throughout the apartment. Very shortly a blue box was found (measuring on two sides 3 1/2 and 4 1/2 inches). The search continued for another hour or more and resulted in further seizures: an attaché case with electronic intercepting equipment, a musette bag with burglarious tools and some electronic equipment, a quantity of marihuana and a pipe with marihuana residue, and two automatic handguns with a considerable amount of ammunition.

1. The search is attacked as illegal from the start because the application for the warrant, presumably following the form set out at G. L. c. 276, § 2 B,[4] was signed by Kiley who was also the affiant of the affidavit supplying the basic facts. The defendant contends, as we understand him, that the applicant must be an officer, not a private individual. The language of the statute is not altogether clear,[5] but we

---

which is designed to be used in connection with or instead of a 'blue box,' and any other material which is designed or used for switching or generating a 2600 Hz signal for use with telephone facilities and plans, instructions and publications relating to the operation of a 'blue-box', which are being used to further a scheme to defraud by means of a wire communication in violation M.G.L. Chapter 166 Section 42A and 42B."

[3] See *Bond* v. *Commissioner of Pub. Safety,* 1 Mass. App. Ct. 536 (1973). Bond's name was originally Walter G. Billings.

[4] Certain original papers were not available at trial and secondary evidence was admitted.

[5] We may say, briefly, that the language of G. L. c. 276, § 1, regarding issuance of a search warrant may possibly be read as intimating that a

are not called on to attempt a definitive interpretation because the assistant attorney general was present in person and thus gave clear official sponsorship to the application, which satisfies the essence of the claimed requirement. The warrant itself, following the form at § 2A, was properly addressed "[t]o the Sheriffs of our several counties, or their deputies, any State Police Officer, or any Constable or Police Officer of any city or town, within our said Commonwealth," and was executed conformably.

We add, first, that having officers rather than private individuals make the formal applications to magistrates for search warrants is not only the customary practice but the desirable one. It may be noted that Rule 41(a) of the Federal Rules of Criminal Procedure was recently so amended as to ensure that private applications are excluded.[6] Second, we stress that using the affidavit by Kiley, in support of the application, to supply the basic information establishing probable cause, was both proper and commendable because he had direct knowledge of the facts. Frequently the magistrate acts on an affidavit which consists only of a hearsay summary of information provided to

---

private person may apply, whereas § 2B setting out the form of the application (which is itself an affidavit) invites the applicant to "describe position, assignment, office, etc.," which indicates that he or she is an officer.

[6] The pertinent language of rule 41(a), as amended in 1972, is: "A search warrant authorized by this rule may be issued . . . upon request of a federal law enforcement officer or an attorney for the government." See Preliminary Draft of Proposed Amendments to the Federal Rules of Criminal Procedure for the United States District Courts 72-73 (Judicial Conference of the United States, Committee on Rules of Practice and Procedure, 1970). See also Model Code of Pre-Arraignment Procedure 508-509 (1975).

The search warrant question is distinct from that of applications by private persons for criminal complaints, discussed in *Commonwealth* v. *Haddad*, 364 Mass. 795, 798-800 (1974). Cf. *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315 (1977). It was noted in *Haddad* that the danger of harassment by private complaints was mitigated by G. L. c. 218, § 35A, which allows a person complained of to oppose issuance of the complaint against him. A search warrant issues ex parte and results in an immediate intrusion.

the affiant by others. Where feasible — and we are quite aware that it is not always so — it is the better practice to produce the more direct evidence. Cf. *Commonwealth* v. *Reynolds*, 374 Mass. 142, 144 (1977).

2. Except for the argument just disposed of, it is not questioned that the Kiley affidavit justified the issuance of a search warrant with the breadth shown at n.2. Thus the warrant legalized a search throughout the apartment in pursuit of the materials described. See *Commonwealth* v. *Hawkins*, 361 Mass. 384, 387 (1972). The officers were not required to stop with the blue box which was validly seized at the center of the search and would indeed have been less than fully obedient to the command of the warrant if they had done so. If further search should turn up additional materials designated in the warrant, those of course could be taken. Moreover, in the process of a continuing search directed to finding the designated materials — not a merely general exploratory search or a search pointed to things known or suspected to be present but not mentioned in the warrant (cf. *Commonwealth* v. *Rand*, 363 Mass. 554, 558 n.2 [1973]) — the officers could seize articles "in plain view." By that somewhat misleading expression is meant articles which are come by "inadvertently" — without particular design — and which, on being discovered, are reasonably believed by the officers to be connected with criminal activity. See *Commonwealth* v. *Wojcik*, 358 Mass. 623, 626-630 (1971); *Coolidge* v. *New Hampshire*, 403 U.S. 443, 465-467 (1971). It is not required that the police, having already lawfully disturbed privacy, shall delay an otherwise valid seizure to abide their procuring another warrant. *Anglin* v. *Director, Patuxent Inst.*, 439 F.2d 1342, 1347 (4th Cir. 1971).

A distinction should be taken here. "Mere evidence" inadvertently found, see *Coolidge, supra* at 464, may be seized only if the officers recognize it to be plausibly related as proof to criminal activity of which they were already aware. The "nexus" problem was examined in *Warden* v. *Hayden*, 387 U.S. 294 (1967), and that and other cases were

recently applied in *Andresen* v. *Maryland*, 427 U.S. 463 (1976), to a situation of unnamed documentary items turning up during search under a warrant.

There is other material that may be taken not only in the circumstances just described, but also when it bespeaks the likelihood of some criminal conduct of which the officers may have had no prior awareness.[7] This material comprises, to quote the Model Code of Pre-Arraignment Procedure, "contraband, the fruits of crime, or things otherwise unlawfully possessed" and "weapons or other things used or likely to be used as means of committing crime" (often called instrumentalities of crime). *Id.* at § SS 210-3(1)(b) and (c); see §§ SS 220.3(5), 260.6. See also *Commonwealth* v. *DeMasi*, 362 Mass. 53, 58-59 (1972); *State* v. *Wilson*, 279 Md. 189, 194-198 (1977); *United States* v. *Golay*, 502 F.2d 182, 185 (8th Cir. 1974); *United States* v. *Honore*, 450 F.2d 31, 33 (9th Cir. 1971), cert. denied, 404 U.S. 1048 (1972).

There is no difficulty in holding valid the seizure in the present case of the substance recognized as marihuana, although, be it noted, scientific proof that it was such, as well as proof of the knowing possession needed ultimately to establish the crime, were not available at the moment of taking. The marihuana was nevertheless "contraband," and seizable. See *Commonwealth* v. *Wojcik, supra* at 631.

In the category of "instrumentalities" were the electronic devices for interception, and chief among these was the attaché case with self-contained equipment, including concealed microphone and tape recorder, for receiving oral communications. It appeared likely that this rig and the electronic items in the musette bag were designed and kept for clandestine and thus for illegal use. For possession of intercepting devices is illegal "under circumstances evincing an intent to commit an interception" not allowed by the statute, G. L. c. 272, § 99 C 5, as appearing in St. 1968,

---

[7] The line drawn here between "mere evidence" and other material in plain view is of course not always an obvious one.

c. 738, § 1; and § 99 outlaws generally clandestine record-ings of oral communications. The tools seized — including wire strippers, a complete lock-picking kit, an inertial ham-mer, a "shove knife," and tinfoil (capable of circumventing alarm systems) — were adapted for accomplishing various kinds of break-ins and, it seemed, for little else (full-blown violation of G. L. c. 266, § 49, requires a keeping of the im-plements in order to commit a crime, which need not be burglary or larceny). The guns and ammunition [8] could be readily linked in purpose to the burglar's tools; on occasion, indeed, when associated with equipment for break-ins, guns have been considered "burglarious" within the meaning of the familiar statutes. [9]

To the inferences invited by the very appearance and nature of the instrumentalities (see *Harp* v. *State*, 136 Ga. App. 897 [1975]; *State* v. *Harris*, 143 N.J. Super. 314 [1976]; *State* v. *Larkin*, 87 S.D. 61 [1972]), further per-suasive factors are added. Through the discovery of the blue box, the officers had knowledge that the defendant very probably was involved in the commission of crime (see *Brinegar* v. *United States*, 338 U.S. 160, 170 [1949]; *Anglin* v. *Director, Patuxent Inst.*, 439 F.2d 1342, 1348 [4th Cir.

---

[8] The argument for suppression concentrated here on the .25 caliber handgun which was the subject of the prosecution under the firearms law.

We need not consider whether the handgun in the present situation, but without the association mentioned which put it into the "instrumentality" category, could qualify as "contraband" when the lack of an identifica-tion card was not known to the officers and a direct question seems not to have been put to the supposed owner. In prior cases a handgun was taken as "contraband" when found with a defaced serial number (*Com-monwealth* v. *Pellier*, 362 Mass. 621, 624 [1972]), or was seizable as "evidence" of a committed crime (*Commonwealth* v. *Cook*, 364 Mass. 767, 771 [1974]). Weapons found in moving vehicles, and shotguns and like weapons are easier cases for warrantless seizure (assuming, of course, that the officer comes upon them in some lawful manner). See *Com-monwealth* v. *Wilson*, 360 Mass. 557, 560 (1971); *United States* v. *Canestri*, 518 F.2d 269 (2d Cir. 1975); *United States* v. *Sedillo*, 496 F.2d 151, 153 (9th Cir.) (Hufstedler, J., dissenting), cert. denied, 419 U.S. 947 (1974).

[9] See, e.g., *People* v. *Stewart*, 23 Ill. 2d 161 (1961); *State* v. *Bryan*, 69 Ohio App. 306 (1942); *Burnette* v. *Commonwealth*, 194 Va. 785 (1953).

1971]), and crime of a type not distant from that suggested by the other electronic materials found. Cf. *Aron* v. *United States*, 382 F.2d 965, 973 (8th Cir. 1967). And, as the judge reasoned, the discovery at the site both of the burglar's tools and the electronic equipment (to some extent in physical association in the musette bag) reinforced the case for the seizure of each category, as illegal interception could be expected often to require illegal entry. Cf. *Commonwealth* v. *Jones*, 355 Mass. 170, 176 (1969).

With respect to "instrumentalities" as with "fruits" and other things taken on a basis of "plain view," there is always a question how tendentious the material must be, how close a bearing to crime it must appear to have, in order to legalize seizure. To the degree that the connection is allowed to be lax, the evils of unconstitutional general warrants may be introduced. On the other hand, it is acknowledged that the relevant judgments made by the officers need not be proved correct in hindsight; they need only have been sensible when made. See *United States* v. *Ross*, 527 F.2d 984, 985 (4th Cir. 1975), cert. denied, 424 U.S. 945 (1976); *United States* v. *Golay*, 502 F.2d 182, 185 (8th Cir. 1974).

Considering what was known and observed by the officers, we think they were justified in their immediate reaction of taking the intercepting and other devices and articles into custody to abide further investigation and decision whether to prosecute. Their response seems no less proper as a police measure than those permitted as to evidence or "fruits" in *Commonwealth* v. *Haefeli*, 361 Mass. 271, 281 (1972), habeas corpus granted sub nom. *Haefeli* v. *Chernoff*, 394 F. Supp. 1079 (D. Mass.), rev'd, 526 F.2d 1314 (1st Cir. 1975); *Commonwealth* v. *DeMasi*, 362 Mass. 53, 58-59 (1972). Cf. *Commonwealth* v. *Hawkins*, 361 Mass. 384, 386 (1972); *Commonwealth* v. *Wojcik*, 358 Mass. 623, 631 (1971). See also *United States* v. *Dauphinee*, 538 F.2d 1 (1st Cir. 1976); *Aron* v. *United States*, 382 F.2d 965 (8th Cir. 1967); *United States* v. *Eisner*, 297 F.2d 595 (6th Cir. 1962); *State* v. *Harris*, 143 N.J. Super. 314 (1976).

As to burden of proof: When the defendant was challenging the search warrant, valid on its face, on the ground that Kiley was not a proper applicant, the burden was on the defendant to demonstrate the illegality. It is not altogether clear on the record that the judge had in mind a similar allocation of the burden when the proceedings turned to the seizure in plain view which, as it relied on an exception from the usual requirement of a search warrant describing the things to be seized, might well call for a demonstration of legality on the part of the Commonwealth. See *Commonwealth* v. *Antobenedetto*, 366 Mass. 51 (1974).[10] In any event we think the judge's mistake, if there was one, would be harmless, as the result should be the same if the burden were considered to be shifted. What had to be shown was more than a suspicion of criminal involvement, something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt. See Model Code of Pre-Arraignment Procedure, *supra*, § 120.1(2)(3), Commentary at 292 ff.; § SS 210.1(7)(a)(b), Commentary at 499-501.

3. The defendant was convicted of possession, without identification card, of a firearm, a .25 caliber Bauer automatic handgun, one of the two guns seized. He claims exemption because he held a Federal firearms dealer's license (due to expire two days after the search and his simultaneous arrest), but we cannot fault the judge's finding that this weapon, holstered, loaded with a clip of "silver" bullets, and accompanied by a clip of copper-jacketed bullets, all found in a night table next to the defendant's bed, did not, in the circumstances and setting, fit the language or purpose of G. L. c. 140, § 129C (*b*).[11]

*Judgments affirmed.*

---

[10] The defendant called his witnesses first, which was correct at least on the point about Kiley's applying for the warrant. The entire motion was handled informally.

[11] "The provisions of this section shall not apply to the following exempted persons and uses: . . . (*b*) Federally licensed firearms manufacturers or

---

wholesale dealers, or persons employed by them or by licensed dealers, or on their behalf, *when possession of firearms, rifles or shotguns is necessary for manufacture, display, storage, transport, installation, inspection or testing;. . . .*" (Emphasis added.)